**Robert A. REED, et al., Plaintiffs,**

**v.**

**James A. RHODES, et al., Defendants.**

**No. 1:73 CV 1300.**

United States District Court,
N.D. Ohio,
Eastern Division.

April 26, 1996.

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Cleveland, Ohio, David W. Whitaker, Beachwood, Ohio, for Plaintiffs.

Wanda Rembert Arnold, Cleveland Board of Education, Law Department, Cleveland, Ohio, for Local Defendants.

Stephen M. O'Bryan, Margaret Anne Cannon, Kelley, McCann & Livingston, Cleveland, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State Defendants.

## ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation.

Pursuant to 42 U.S.C. § 1988(b), the Court is charged with the authority and responsibility of reviewing and, within its discretion, awarding reasonable attorneys fees to the prevailing party "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, [or] 1983 . . . ."

Before the Court, for the second time, is the application of plaintiffs' counsel Thomas I. Atkins (Atkins), 135 Eastern Parkway, Apt. # 11–B–1, Brooklyn, New York 11238, for legal services performed between the dates of 7/6/94–8/4/95 at a rate of $340.00/hour, accrued in half-hour (30–minute) increments, for a total of $126,401.04, plus out-of-pocket costs and a fee submission for the consultation services of a Dr. Robert L. Green at $75.00/hour, accrued in half-hour (30–minute) increments, for an additional $36,057.50, for an aggregate of $162,458.54;[1] the application of James L. Hardiman (Hardiman) of Cleveland, Ohio for legal services performed between 3/2/92 through 12/28/92 at $175.00/hour, for a total of $20,256.25, 1/7/93 through 12/22/93 at $175/hour, for a total of $74,200.50, 1/6/94 through 12/30/94 at $200/hour, for a total of $119,300.00, and 1/3/95 through 8/31/95 at $225/hour, for a total of $50,006.25, accrued in half-hour (30–minute) increments, with out-of-pocket expenses of $386, for an aggregate of $263,786.00;[2] and the application of David W. Whitaker (Whitaker) of Beachwood, Ohio from 11/22/92 through 12/28/92 at a rate of $160/hour, for the period between 1/7/93 and 12/22/93 at $160/hour, for the period between 1/14/94 and 12/27/94 at $160/hour, and for the period 1/8/95 and 9/1/95 at $160/hour, all accrued in half-hour (30–minute) increments, for a total of $102,307.99,[3] plus out-of-pocket expenses of $427.00, for an aggregate of $102,734.99, aggregating a grand total for all applications submitted by plaintiffs' counsel of $528,979.53.

Subsequent to the initial fee submissions and after they had been proffered to the Court's Legal Advisory Commission for review and comment (Appendix A), plaintiffs' counsel on October 25, 1996 jointly filed a pleading styled a Motion for an Interim Award of Fees and Costs, with supporting briefs. The motion requested an interim payment of fees and costs to Thomas I. Atkins in the amount of $63,200.52, plus $18,028.75 to Dr. Robert L. Green, his consultant, for a total of $81,229.27; to James L. Hardiman in the amount of $131,893.00; and to David W. Whitaker in the amount of $51,153.95. (The above figures have been recalculated and corrected).

The Court recognized its discretionary authority to award *reasonable* interim attorneys fees to a prevailing party in a 42 U.S.C. § 1983 action arising from infringements of

---

1. The Atkins amended application seeks legal fees aggregating $162,066.87, a reduction of $391.67 from previously claimed expenses listed in his first fee petition.

2. The Hardiman amended application seeks legal fees aggregating $264,148.50, an increase of $362.50 over his first fee petition. The disparity results from mathematical miscalculations.

3. Whitaker has refiled his first application without monetary changes.

protected constitutional rights; however, because a preliminary examination of the initial fee applications and supporting logs disclosed practices and line entries of material concern to both the Legal Advisory Commission and the Court, and because the form and substance of each application reflected relevant ambiguities which solicited explanation and/or reconciliation, the Court, upon approving payment of interim fees in the following amounts:

| Thomas I. Atkins | $ 42,133.68 |
| Robert L. Green | 12,019.17 |
| James L. Hardiman | 87,926.47 |
| David W. Whitaker | 33,388.86 |

returned the fee requisitions to the respective petitioners for resubmission after a reassessment of their individual fee requests pursuant to a twenty-page contemporaneously-issued interim order (Appendix B), wherein the Court attempted to correct the petitioners' misconceptions of prevailing legal precedent which addressed the issues of legal fee awards, and wherein the Court identified, with particularity, the areas of ambiguity which prompted its concern.

The Court accorded plaintiffs' counsel forty-five days within which to reconsider their fee applications and produce evidence in a hearing before the Court, by affidavit, deposition, or otherwise to, *inter alia*, support their requested hourly rates and time commitments; to prove that their logged entries were meaningful, informational, and instructive; to support the relevance, scope, materiality, and/or necessity for the applicants' endless intratelephonic conversations between plaintiffs' multiple counsel; to evince the absence of duplicated effort; to prove that the hours billed were not excessive or otherwise unnecessary; and to prove that accruing expended time in half-hour (30–minute) increments was and is the accepted billing practice within the greater Cleveland, Ohio legal community.

Applicants have elected to respond to the Court's invitation by resubmitting their original applications with inconsequential amendments, together with the affidavits of two practicing attorneys attesting to prevailing hourly rates within the greater Cleveland legal community, and a Memorandum of Decision as to Attorneys Fees within the venue of the United States District Court of Massachusetts (Boston) authored by Judge Arthur W. Garrity, Jr. in *Morgan v. Gittins*, wherein he approved a $300/hour rate payable to Atkins in that desegregation case. Applicants have also submitted a brief in justification of their resubmitted fee applications.

The Court's December 29, 1995 interim order returning petitioners' fee requests for reassessment is, in material parts, reviewed and incorporated herein in the format of a final disposition.

The burden placed upon the Court by 42 U.S.C. § 1988 is a heavy one, particularly within the context of the instant case. In exercising its discretion in this highly controversial area, the Court must be ever mindful of fundamental principles that ensure fair, impartial, and equitable treatment of all interested parties, including their legal counsel.

■ It should be noted that the Court subscribes to and endorses the concept that the plaintiffs and all defendants, the State of Ohio Board of Education, the City of Cleveland School District, and its Board of Education should be free to retain the most qualified available legal talent of their own choice without interference from the Court.

■ The Court also subscribes to and endorses the universally accepted definition of reasonable legal fees enunciated by the Supreme Court, and echoed by every circuit court which has considered the issue in a school desegregation case, as "fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." *Hensley v. Eckerhart,* 461 U.S. 424, 430 n. 4, 103 S.Ct. 1933, 1938 n. 4, 76 L.Ed.2d 40 (1983).

More specifically,

[t]o put these [12] guidelines into perspective and as a caveat to their application, courts must remember that they do not have a mandate under Section 706(k) [of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) ] to make the prevailing counsel rich. Concomitantly, the Section should not be implemented in a manner to make the *private attorney general's position so lucrative as to ridicule the*

*public attorney general.* The statute was not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical [sic] burden of Title VII litigation. Adequate compensation is necessary, however, to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession. The guidelines contained herein are merely an attempt to assist in this balancing process.[4]

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 719–20 (5th Cir.1974) (emphasis added); *see also Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974); *aff'd,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Swann v. Charlotte–Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975).

*Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937, also dictates that "[t]he amount of the fee, of course, must be determined on the facts of each case." This statement does not lighten the Court's burden in the case at bar but rather poses a material obstacle in pursuing a resolution because, on March 3, 1995, when the Cleveland School District was placed under the supervision of the Ohio Board of Education and its Superintendent of Instruction by this Court (a copy of its Order is attached for convenience as Appendix C), it was and continues to be hopelessly *bankrupt.*

It had exhausted its half billion dollar annual budget, was confronting a shortfall of $30,000,000, and was in need of an immediate loan in that amount, which it was unable to negotiate. It required the funds to meet daily operating expenses and payroll until June 30, 1995 (the end of its fiscal year) because it had, during the 3½ short years immediately preceding the March 3, 1995 court order, escalated its indebtedness from $35 million to a staggering and irreversible $140 or more million as a direct result of politicized mismanagement.[5]

■ Although the fiscal condition of the District does not directly impact upon counsel's right to an award of reasonable attorneys fees, and this Court excludes it from consideration in arriving at a reasonable fee allowance, it recognizes, however, that every dollar of an *excessive* fee award is a dollar diverted from the education of the District's student enrollment and from the Court's ability to efficiently and effectively implement its various remedial orders. Thus, in the instant case, the fiscal condition of the District is material only to emphasize the necessity for a more scrutinizing review of legal fee submissions.

■ The Court has read with interest the briefs of plaintiffs' counsel in support of their fee applications which imply that certain sections of *Northcross v. Board of Education of Memphis,* 611 F.2d 624, 641 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) are in conflict with, and

---

**4.** In the instant proceeding, Special Counsel, appointed by the State of Ohio Attorney General to represent the defendant State of Ohio Board of Education and its Superintendent of Instruction, who is of equal competence and longevity as plaintiffs' counsel, is compensated at a rate of $95.00 per hour accrued in one-tenth of an hour (or six-minute) increments, as compared to a $340.00/hour rate requested by Atkins, plaintiffs' New York counsel, accrued in half-hour (30-minute) increments, and $160.00 to $225.00/hour, as requested by plaintiffs' Cleveland counsel, all accrued in half-hour (30-minute) increments.

**5.** During the same time frame (1993–94), the student daily absentee rate in grades 9 through 12 increased to 29% (from Cleveland Public Schools Report: "Attendance Rates 1989–90 through 1993–94"); the cohort student dropout rate in grades 10 through 12 rose to 35% (from

District Periodic Status Report (PSR) Specification 2b); the 9th to 10th grade non-promotion rate was 42% of the total enrollment of those grades, which rate rose to 61% by the end of the 1994–95 school year in June of 1995 (from Cleveland City School District 2A–Promotes/Nonpromotes Annual Report(s) for Academic Year(s) 1993–94 and 1994–95); the 10th to 11th grade non-promotion rate was approximately 32%, which rose to 38% by the end of the 1994–95 school year in June, 1995 (*id.*); the 11th to 12th grade non-promotion rate was approximately 26%, which non-promotion rate rose to 31% by the end of the following school year in 1995 (*id.*); and demonstrated student proficiency (predicated upon the results of the March, 1995 4th grade proficiency test) of Ohio large urban school districts reached the lowest level in the state (from Cleveland Public Schools Report: "Fourth Grade Proficiency Test Results", 6/28/95).

override, at least in this circuit, the "12 *Johnson* factors" enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). Counsel misinterpret the pronouncements of *Northcross* and other existing legal precedent that address fee awards generally and, more particularly, in school desegregation cases. Contrary to counsel's inferences, the twelve "*Johnson* factors" [6] are guidelines recommended by the American Bar Association's Code of Professional Responsibility, Ethical Consideration 2–18, Disciplinary Rule 2–106. *Id.* at 719. They are not inflexible elements to be rigidly applied in deriving a reasonable fee award. They are exactly what they purport to be, namely, *guidelines* to be considered along with all other factors that have evolved in common law and the exercise of experience and sound judgment. The Sixth Circuit's rationale in *Northcross* merely amplified the application of the *Johnson* guidelines without conflict with its findings and conclusions. However, assuming *arguendo* the existence of conflict between the dispositions, the Supreme Court adopted the "12 *Johnson* factors" in *Hensley,* in 1983, five years after the Sixth Circuit's 1979 decision in *Northcross.* The pronouncements of *Hensley* and its progeny, accordingly, would supersede areas of conflict, if any had existed, and would accordingly remain the prevailing precedent in resolving the issue of § 1988 fee awards.

The responsibility of the trial court in awarding fees in cases of this kind is a thankless one because it is necessarily called upon to question the time, expertise, and professional work effort of lawyers appearing before it, which is difficult and distasteful. In all probability, its decision will be unsatisfactory to all concerned.

■ The trial judge's burden to conserve and protect the School District's revenues has, at least to some degree, been lightened by the findings, conclusions, and mandates of the Supreme Court expressed with clarity and precision by Justice Stevens in *Hensley,* and by pronouncements of the other circuits which have judged the issue. This Court accepts the direction of *Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40, that counsel for prevailing parties be paid, as is traditional with attorneys compensated by a fee-paying client *within the venue of the litigation,* for all time *reasonably* expended on a matter. As nearly as possible, *market standards within the community of the action should prevail,* for that is the best way of ensuring that competent counsel will be available to all persons with bona fide civil rights claims. In *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 718, the Fifth Circuit stated:

> The customary fee for *similar work in the community* should be considered. It is open knowledge that various types of legal work command differing scales of compensation. (Emphasis added).

■ A review of prevailing hourly rates within the Cleveland legal community by the Legal Advisory Committee and the Court reflects that they comport with the broad spectrum of hourly rates charged by various Special Counsel in the instant proceeding:

1. Special Counsel for the defendant State of Ohio Board of Education and its Superintendent of Instruction in the instant case is paid a rate of $95.00 per hour by the State of Ohio Attorney General, accrued in tenths of an hour (six-minute) increments;

2. Special Counsel for the Cleveland Board of Education charged the following rates during the period under review:

---

6. The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations or other circumstances imposed by the client; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–19. These factors derive directly from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106.

| | | |
|----|----------------------------------------------|--------------|
| a). | Squire, Sanders & Dempsey<br>Cleveland, Ohio | $187.00/hr. |
| b). | Hogan & Hartson<br>Washington, D.C. | $165.00/hr. |
| c). | Teamor, Thompson & Associates<br>Cleveland, Ohio | $145.00/hr. |
| d). | Daniel J. McMullen,<br>Calfee Halter & Griswold<br>Cleveland, Ohio<br>(Court's Special Counsel) | $175.00/hr. |

The Court also concludes that the above-listed range of hourly rates are realistic and adequate to attract and ensure the participation of competent, quality legal counsel necessary to pursue the limited remaining issues of this case.

Accordingly, without justification to the contrary, upon considering the prevailing hourly rates within the greater Cleveland legal community generally, coupled with actual legal fees charged by qualified Cleveland lawyers and prominent Cleveland legal firms to address the issues of the instant desegregation case, the Court determines the lode star prevailing fair and reasonable rate for legal services to address the issues and controversies common to this desegregation action in this community to be $175.00 per hour, but no greater than $200.00 per hour.

■■■ Existing legal precedent recognizes that a prevailing applicant seeking fees *bears the burden of proving entitlement to an award* by documented records of the hours expended and the hourly rate applied, with the proviso that "[p]laintiffs' counsel, of course, is not required to record in great detail how each minute of his time expended." *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. However, the applicant "who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of time expended, the nature and need for service, and the reasonable fees to be allowed." *Id.*, 461 U.S. at 441, 103 S.Ct. at 1943 (Burger, C.J., concurring); *see also Johnson* and *Northcross*. Applicants, relying upon extrapolated language from *Hensley* that directs "the district court to provide a concise but clear explanation of its reasons for the fee award" erroneously infer that the mere filing of a fee application satisfies the petitioner's burden of proof and the burden is thereupon shifted to the Court to prove by clear and concise explanation the reasons for its adjustments. The interpretation is misplaced and belies Chief Justice Burger's comment in his concurring opinion in *Hensley*, 461 U.S. at 440–41, 103 S.Ct. at 1943 that:

> A district judge may not, in my view, authorize the payment of attorney's fees unless the attorney involved has established by *CLEAR AND CONVINCING EVIDENCE* the time and effort claimed and [has] shown that the time expended was necessary to achieve the results obtained. (Emphasis added.)

Nine years earlier, the Fifth Circuit, in *Johnson*, 488 F.2d at 720, when addressing the initial burden placed upon an applicant for attorneys fees, directed that

> it must be kept in mind that the plaintiff has the burden of proving his entitlement to an award for attorney's fees just as he would *BEAR THE BURDEN OF PROVING A CLAIM FOR ANY OTHER MONEY JUDGMENT.* (Emphasis added.)

This language indicates the standard of proof to be a preponderance of the evidence. *Id.* Plaintiffs' dilemma in this proceeding is that their applications presently before the Court not only fall short of both standards, they fall short of a far lesser burden of providing information of sufficient detail or explanation to permit a judge to make a fair and meaningful evaluation of time expended and the nature and need for the services committed, as will be hereinafter more fully discussed.

 Because the district judge has a first-hand understanding of the litigation before him, and has had the opportunity to observe and evaluate the ability and performance of counsel, and because of his desire to avoid appellate review, coupled with his own knowledge, experience, and expertise to gauge the time required to resolve comparable controversies, dictates that the determination of a reasonable attorney fee should be left to his sound discretion. Moreover, the exercise of that judgment should not be set aside unless the Court has clearly abused its discretion. *Hensley,* 461 U.S. at 432, 103 S.Ct. at 1934; *Johnson,* 488 F.2d at 716–17.

An applicant's failure to maintain records identifying distinct claims in sufficient detail from which a neutral judge can make a fair evaluation of time expended, the nature and need for the service, and the reasonable fee to be allowed may materially jeopardize the amount of the award because

> [t]his calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."

*Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40 (*citing Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc*) (emphasis the *Copeland* court's)).

The Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974) noted that:

> Although hours claimed or spent on a case should not be the sole basis for determining a fee, [citation], they are a necessary ingredient to be considered. The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities. *If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted. It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.* (Emphasis added).

 Mindful of this Circuit's admonition embraced by its three-tiered "clearly erroneous" review standard for determining the reasonableness of billable hours submitted by a prevailing party announced in *Wooldridge v. Marlene Industries Corp.,* 898 F.2d 1169, 1176 (6th Cir.1990), this Court proceeds with caution when balancing the hours expended against the degree of success obtained, and resolves the benefit of any doubt in applicant's favor. Common sense dictates that a reasonable fee based on the number of hours actually worked is not synonymous with a reasonable fee based on the number of hours required to resolve a specific issue or controversy. Stated differently, a reasonable fee is one predicated, in part, on time *required* to resolve an issue, *not the time actually expended.*

Unfortunately, there is no precise rule or formula for judging the time *required* versus actual time *expended* to achieve the degree of success, if any, ultimately attained by a prevailing party's efforts. This is especially critical under the circumstances presented

by the participation of plaintiffs' multiple counsel, as in this proceeding, who are individually and collectively addressing a single primary issue by endless intra and inter telephone networking that does not permit or promote effective correlation and review of applicants' individual and collective work product. The Court's meaningful assessment of applicants' work effort is further frustrated in this proceeding by the inadequate non-informative amended billing records that do not permit a reviewing court to identify distinct claims and the issues addressed, assess the necessity for multiple counsel, and distinguish between redundant, unnecessary, and duplicated work effort versus the proper utilization of time.[7]

■ Under similar circumstances where a court's meaningful comparison between *expended hours* versus *actual hours required* to resolve a controversy is defeated by the applicants' inability or refusal to submit meaningful billing records from which a reasonable assessment can be derived, the Court, within its discretion, may deduct a reasonable percentage of hours billed to offset the potential duplication of services expended and other indeterminable issues of concern.

A review of the record in this case discloses that historically and, more particularly, within the last four years, the award and payment of legal fees to plaintiffs' counsel and Cleveland School Board attorneys has been treated in a cavalier manner in disregard of the pronouncements of *Hensley, Northcross,* and *Johnson.* During this period, plaintiffs and Cleveland School Board counsel have engaged in a practice, condoned by the local school board and its general counsel, of reciprocal accommodation by waiving objections to opposing fee applications despite apparent questionable billing practices.

■ The rejection of *Hensley, Northcross,* and *Johnson* criteria by the local school board during the last four years, which may have resulted in the award and payment of excessive legal fees to plaintiffs and the local board attorneys, have been abetted by withholding those applications and payments from taxpayer scrutiny by a "work product" privilege classification unilaterally imposed by the board's general counsel. A review of the past and present applications submitted by plaintiffs' lawyers and board counsel discloses no information that could be considered as material work product.

■ Additionally, because the fees paid to multiple law firms representing the defendant School District as special counsel were and are payable from a common public fund (Desegregation Fund # 12)[8] with those paid to plaintiffs' counsel, and because any excessive award of fees to the School District's counsel also diverts funds from the education of students in the District and impairs this Court's implementation of its remedial orders, the guidelines of this Order apply with equal force to past, present, and future fee applications of special counsel for the District.[9] The Court also directs that all future

---

7. Commenting on an applicant's failure to carry his assigned burden of proof, the Supreme Court has stated:

 "we would not view with sympathy any claim that a district court *abused its discretion in awarding unreasonably low attorney's fees* in a suit in which plaintiffs were only partially successful *if counsel's records do not provide a proper basis for determining how much time was spent on particular claims." See Hensley* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12; *quoting Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir.1978). (Emphasis added)

8. Special Counsel appointed by the State of Ohio Attorney General to represent the State of Ohio Board of Education and its Superintendent of Instruction are paid from State funds and not from the City of Cleveland School District's reve-

 nues (Desegregation Fund # 12). Consequently, those payments do not reduce funding more appropriately allocated to student educational efforts and accordingly are not of concern to the Court.

9. A cursory review of payments authorized by Cleveland Board of Education resolutions to its legal counsel and paid from Desegregation Fund # 12 during the fiscal year 1994 and between the period of 2/23/95 and 6/23/95 reflect what appears to be a total disregard for the Supreme Court's admonitions and dictates expressed in *Hensley.*

 For example, during the fiscal year 1993–94, the Cleveland Board of Education paid, *without objection,* fee schedules submitted by Squire, Sanders & Dempsey in the amount of $376,-

fee applications of the District's special counsel, will be reviewed by the Office on School Monitoring and Community Relations for compliance with the dictates of this Order and the mandates of the Supreme Court in *Hensley.*

Accordingly, the Court orders that since past, present, and future fees paid to plaintiffs' and local board special counsel in this case flow from taxpayer funds, the *amount* of fee awards shall be a matter of public record, and all fee applications past, present, and future shall be presumed to be a public record, unless a party invoking the "work product" or "privileged communication" doctrines have justified the assertion.

The threshold requirement to qualify for an award of legal fees pursuant to 42 U.S.C. § 1988 is compliance with the "prevailing party" standards evolved by the Supreme Court in *Hensley.*

It is true that plaintiffs, in the instant school desegregation action, were initially successful in their efforts which resulted in the late Judge Battisti's August 31, 1976 remedial order as reaffirmed on February 6, 1978. Although this Court was not privy to his subsequent remedial orders, it assumes that plaintiffs were equally successful in "substantially advancing their clients' interests" by obtaining "significant concession[s] from the defendants" as a result of prosecuting the merits of each of those successive actions on their individual merits. *Hensley,* 461 U.S. at 430–31, 103 S.Ct. at 1938. However, past successes, for which counsel have been paid, do not necessarily embrace all successive future issues that may arise during the implementation of a remedial order entered twenty or more years ago.

■ It would appear from *Hensley* that, to qualify as a "prevailing party" seeking relief arising from successive interpretations and implementations of a seminal remedial order, subsequent successive action undertaken by applicants must address a "substantial" claim which, through the efforts of the applicants, has advanced their clients' interests by obtaining *significant concessions* from the defendant.

■ In considering the impact of the "prevailing party" doctrine, the Court and counsel should be mindful of the Supreme Court's findings in *Hensley* that:

> If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. *Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill.* Again, the most critical factor is the degree of success obtained.

> Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. In this

---

156.81, Hogan & Hartson of Washington, D.C.—$280,580.46, and Teamor, Thompson & Associates—$258,522.89, for a total of $915,260.60 (from the Office on School Monitoring and Community Relations calculation based on Cleveland Board of Education Resolutions passed during fiscal year 1993–94). The above payments were approximately three times greater, or 300% more, than the fees paid to plaintiffs' legal counsel or the fees paid to the State Board of Education's counsel for addressing the same issues and controversies arising during the same time period.

It also appears that $243,888.35 of $297,681.70 paid to Squire, Sanders & Dempsey for the period between 2/3/95 and 6/23/95, and $127,672.59 of a $198,730.11 fee paid to Teamor, Thompson & Associates for the same period, were paid without review or resort to determining compliance with the Supreme Court's mandates in *Hensley.* Moreover, the payments were authorized by invalid Board resolution enacted after this Court's Order of March 3, 1995, and must, accordingly, be reassessed and approved by the State Board of Education for compliance with *Hensley* and this Order.

case, for example, the District Court's award of fees based on 2,557 hours worked may have been reasonable in light of the substantial relief obtained. But had respondents prevailed on only one of their six general claims, for example, the claim that petitioners' visitation, mail, and telephone policies were overly restrictive [citation], a fee award based on the claimed hours clearly would have been excessive. There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

*Id.,* 461 U.S. at 436, 103 S.Ct. at 1941 (emphasis added).

In *Kelley v. Metropolitan County Bd. of Education,* 773 F.2d 677 (6th Cir.1985) (*en banc* ), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986) an *en banc* panel of the Sixth Circuit applied *Hensley* in a context similar to this case. In *Kelley,* the lower court had awarded attorneys' fees to plaintiffs "for time spent [on] unsuccessful charges of contempt against the Board, yet unresolved matters as to faculty composition, and their efforts to keep Pearl High School open." *Id.* at 685 n. 7. In reviewing the propriety of these awards, the *en banc* circuit in *Kelley* remanded the case to the lower court to "follow the mandate of *Hensley* to determine which claims plaintiffs have succeeded upon and those which they have not, and to calculate the attorneys' compensable hours accordingly[.]" *Id.* at 686. After *Hensley,* the *Kelley* court directed, "a party's request for attorney's fees [should] be carefully scrutinized as to the extent of success on each claim, and further, that time spent on unsuccessful claims that are distinct from successful claims should be excluded in determining a reasonable fee." *Id.* at 685.

■ The applications before the Court disclose that the majority of the billed time during the period 7/6/94 through 7/12/95 accrued from negotiations that resulted in the Joint Stipulation dated May 16, 1995 which modified the then existing intractable mathematical school student assignment policy of 70% minority ± 15% by adopting a controlled parental choice school student enrollment procedure. The amendment was opposed by plaintiffs. Because the resolution of the issue resulted in a Joint Stipulation, the Court concludes that plaintiffs' contribution to the result was equal to the efforts of the defendants. Consequently, plaintiffs qualify as a "prevailing party" to the degree of their contribution in formulating the May 16, 1995 agreement.

Within the context of the *"Johnson* factors" guidelines, few, if any, of the unique legal and sociological confrontations that impacted an award of legal fees in early school desegregation litigation remain today, having faded into history since the Supreme Court's seminal decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), some forty-two years ago.

■ During the time frame of the instant fee applications, the Court finds that no novel or difficult issues confronted the applicants beyond the ordinary legal questions that routinely surface in an ongoing school desegregation case. Applicants have not been precluded or hampered from accepting employment or retainers as a result of participating in this legal action; the payment of their fees is assured and awarded pursuant to the dictates of *Hensley;* and any stigma which may have attached in certain quarters during the 1950s, 60s, and 70s to litigating school desegregation cases has also fortunately passed with the evolution of time.

Assessing the novelty and difficulty of the issues involved, the *Johnson* court recognized that:

Cases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may "make new law." *Johnson,* 488 F.2d at 718.

With the exception of the most recent landmark disposition in *Missouri v. Jenkins,* —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), the evolution of school desegregation law from *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) to the present, reflects that most, if not all, of the legal issues of first impression which initially attached to school desegregation litigation have been decided by Supreme Court dispositions a number of years ago and by various circuits throughout the nation. Remaining cases in controversy are generally fact specific and indigenous to local community school districts requiring the attention, legal perception, and understanding of local counsel who are members of the community and who are sensitive to the voice of the community from personal observations and involvement.

This is particularly true where, as in the instant case, the primary issue addressed by plaintiffs' counsel between August, 1994 and August, 1995 (the period that accounts for the majority of hours recorded in the applications before the Court) were expended in formulating plaintiffs' response to defendants' posturing for a declaration of incremental unitary status for the student assignment component of the Court's various remedial orders.

The issue of student assignments has been addressed and generally resolved by the Supreme Court and circuits courts in *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); and their progeny. Any novelty or uncertainty that may have attached to it as an issue of first impression, and the risks inherent to its disposition, have long since dissipated.

In sum, the legal services for which payment is requested in the present fee applica-tions are routine services which do not warrant enhanced hourly rates.

 Proceeding to the applications of Atkins and Hardiman, the Court takes no exception to their legal qualifications and longevity [10] in the history of school desegregation litigation including their participation in the case at bar. The Court takes no exception to their academic training or demonstrated legal abilities.

Recognizing Atkins' impressive legal credentials and his requested $340.00 hourly rate accrued in half-hour (30–minute) increments, the Court notes that the legal credentials of Mark O'Neill (O'Neill) of Weston, Hurd, Fallon, Paisley & Howley are equally impressive. He is and has been for many years recognized as one of the most qualified trial lawyers within Cleveland and Ohio and enjoys the highest professional reputation. His longevity in the instant desegregation case, like the longevity of Atkins and Hardiman, dates to its inception in 1973. His demonstrated legal ability, and his knowledge and implementation of desegregation law, are well-documented. He is and has been during the years of this litigation the special counsel of the Ohio Attorney General representing the defendant State of Ohio Board of Education. His present hourly rate is $95.00/hour.

Fredrick R. Nance of Squire, Sanders & Dempsey, Cleveland, Ohio, a highly-qualified trial counsel with academic training and legal ability comparable with those of Atkins, charged the Cleveland School Board Desegregation Fund # 12 $187.00/hour. Hogan & Hartson of Washington, D.C. charged the fund $165.00/hour. Teamor, Thompson & Associates, Cleveland, Ohio, charged the fund $145.00/hour. Daniel J. McMullen of Calfee, Halter & Griswold, Cleveland, Ohio (Court's Special Counsel), with credentials and legal ability equal to those of Atkins, charged the fund $175.00/hour.

Within the menu of present day prevailing hourly rates in the greater Cleveland legal community generally, coupled with the actual

---

10. Apart from case history, the benefits of longevity in any legal proceeding, including school desegregation cases are, in today's state-of-the-art Westlaw and Lexis legal databanks, instanta-neously available by activating an appropriate computer key, without the tedious protracted research demands of previous years.

legal fees charged by lawyers with legal credentials, ability, and experience equally impressive as those of Atkins, the Court, within its discretion, determines that the reasonable hourly rate for Atkins' services in this proceeding to be $187.00/hour.[11]

The Court further observes that Hardiman has been a Cleveland resident sensitive to the voices of the local community and directly involved in the day-to-day administration of this case for the plaintiffs from its inception, and is also a highly reputable and respected lawyer in the greater Cleveland legal community.[12] He is an individual of demonstrated legal ability. Considering and applying the mandates imposed upon this Court by existing legal precedent, together with the prevailing hourly legal rates within the greater Cleveland area as hereinbefore discussed, the Court determines that the reasonable hourly rates for Hardiman's legal services to be:

| | |
|---|---|
| 3/2/92 through 12/28/92 | $175.00/hr. |
| 1/7/93 through 12/23/93 | $175.00/hr. |
| 1/6/94 through 12/30/94 | $187.00/hr. |
| 1/3/92 through 8/31/95 | $187.00/hr. |

Whitaker received a fee of $4,482.50, calculated on a $110.00/hour rate for services performed between 11/11/88 through 5/14/90. He presently seeks payment in the amount of $101,880.00 for expending 636.25 hours (as corrected from 636.75 hours) at $160.00/hour between 11/22/92 and 9/1/95.

A review of his presently filed application again challenges the Court to determine the nature of his services and how they objectively contributed to an identifiable controversy before the Court. He appears to have committed most of his 621 hours as a monitoring liaison between Atkins, Hardiman, and class representatives without explanation of the purpose or need for his seemingly endless meetings.[13] He has recorded attending various court hearings, meetings, and conferences with the court-appointed Special Master and with other legal counsel at which Hardiman was always also present. His presence at these meetings and court appearances is without explanation.

To the Court's knowledge, with one exception during court hearings in March of this year, he has not been called upon to, nor did he, contribute to the occasion. It is virtually impossible to determine from his application

11. This Court acknowledges that Judge W. Arthur Gerrity, Jr. of the United States District Court of Massachusetts, sitting in Boston, Massachusetts, approved Atkins' requested $300.00/hour rate on January 31, 1996 for legal services rendered in *Morgan v. Nucci,* 620 F.Supp. 214 (D.Mass.1985), *modified,* 831 F.2d 313 (1st Cir. 1987).

This Court recognizes and respects Judge Gerrity's exercise of discretion in determining legal fee awards within the venue of the District Court of Massachusetts while sitting in Boston, Massachusetts. Because this Court is unaware of the scope, magnitude, or complexity of the issues presented in the Boston litigation, the involvement or nature of the services required of and performed by Atkins in that case, or the prevailing market standards within the Boston legal community, comparative analysis of his services in that proceeding with his expended services in the instant Cleveland litigation would be inconclusive and it would be highly presumptuous of this Court to analyze that relationship upon sheer speculation.

The citations relied upon by applicants to support their fee petitions are expositions of general legal principles enunciated in *Hensley, Northcross,* and *Johnson,* and their progeny, having been applied as precedent in this decision, afford no beneficial justification or support for the petitioners' initial and amended fee applications filed herein.

12. Atkins, who is a foreigner to the Cleveland locale, conducts his legal practice by telephone from his apartment office at 135 Eastern Parkway, Apt. # 11–B–1, Brooklyn, New York. Between 7/6/94—8–4–95 (approximately 13 months), he was in Cleveland, Ohio on 7/11/94—7/12/94; 9/29/94; 10/1/95; and 3/31/95. He was not present at the May 15, 1995 trial, which commenced and resulted in the Joint Stipulation of that date.

13. Whitaker's daily time logs consistently avoid identifying the class representative or representatives with whom he had either telephone or personal dialogue, or the subject discussed. His purported contacts, although frequent, disclose no purpose or necessity for the recorded discourse. Moreover, his practice of directly communicating with class representatives appears to be in conflict with the court-ordered communication procedure dated September 17, 1992 derived by plaintiffs' counsel to ensure regular, methodical, orderly, comprehensive, and meaningful verbal intercourse between the parents, School District and Cluster Community Councils, and the local Board of Education and its Superintendent through a duly-organized Communications Committee (Appendix D).

**1506**

if he performed legal services, services as a consulting psychologist, or monitoring services. The extent and need for his services are questionable and should be monitored and reviewed. The Court concludes that the hourly rate for his services to be $110.00/hour.

██ Atkins' explanation in justification for accruing time in half-hour or (30–minute) increments is not persuasive. The practice, as demonstrated in these fee submissions, solicits ambiguity that defeats effective oversight and monitoring of the applications for redundancy, duplication of effort, and necessity for the services performed, and severely complicates correlation of fee schedule line entries. Accruing services in half-hour (30–minute) increments also lends itself to pyramiding. For example:

(a). A two, three, or five-minute telephone conversation between plaintiffs' New York counsel, who conducts his legal practice primarily, if not exclusively, by telephone from his apartment in New York City, and who seeks an hourly rate of $340.00 calculated in half hour increments, and one of his two co-counsel in Cleveland, Ohio, who seeks an hourly rate of $225.00 calculated in half-hour (30–minute) increments, results in a charge to the School District of $282.50. If the same telephone communication includes a second Cleveland co-counsel, who seeks an hourly rate of $160.00, also calculated in half-hour (30–minute) increments, that two or three-minute telephone call is escalated to a charge of $362.50. The same three or four-minute telephone call calculated in six-minute increments or tenths of an hour, which is the general practice in the Cleveland legal community, would cost $72.50. As demonstrated, the incremental predicate upon which telephone charges are accrued rises to a high level of significance in the instant action because of the great volume of intra-telephonic communications between plaintiffs' co-counsel and the inter-telephonic communica-

tions between plaintiffs' counsel, individually and/or collectively, and other parties to this case, all of which are difficult to correlate and which emphasize the importance of maintaining contemporaneous records to support fee submissions.

(b). The interaction between incremental charges, hourly rates, and duplication of effort amongst an inordinate number of multiple intra-firm and/or inter-firm counsel representing the same plaintiff or defendant, as the case may be, exacerbates the precipitous mathematical progression which attaches to deriving a reasonable fee award for addressing a controversy and amplifies the Court's concerns. The interplay of these elements, if not properly scrutinized, lends itself to inter-counsel and intra-firm networking which, as previously indicated, could result in pyramiding fees. To illustrate, if, on the same day, one law firm assigns two lawyers to consider an issue, each with a hypothetical hourly rate of $187.00, and they confer, the hourly rate becomes $374.00. If they, in turn, discuss the controversy with a member of the second firm with a hypothetical hourly rate of $160.00, the hourly rate increases to $534.00. If a second member of the second firm with the same hypothetical hourly rate enters the dialogue, the hourly rate is $694.00. If a member of the third firm with a hypothetical hourly rate of $145.00 is consulted, the combined hourly rate is escalated to $839.00, as compared to a $187.00 hourly charge if a single lawyer would have resolved the issue. Depending upon the hourly incremental billing practice, i.e. tenths of an hour or $83.90 on the high side as compared to $18.70 on the low side or $209.75 as compared to $46.75 predicated on a quarterly incremental hourly charge. Accordingly, the burden rests upon the multiple applicants to disprove by proof of sufficient weight any semblance of the above consequence.

As illustrated, the resultant equivocal ambiguity of the individual and collective fee applications frustrates the Court from arriving at a meaningful assessment of applicants' individual contributions to the derivation and execution of the Joint Stipulation dated May 15, 1995 that addressed the high profile subject of student assignments, cross-town busing, and other interrelated sensitive local community-wide concerns.

In light of the foregoing, the Court concludes, and therefore orders, that the acceptable general practice within the greater Cleveland legal community is to accrue expended time in a given controversy in one-tenths of an hour (6–minute) increments, which practice will be applied in calculating all legal fee applications, including future fees and those presently before it, submitted by prevailing parties in this desegregation case.

█ In considering the three applications presently before it, and in all other instances, the Court recognizes a legitimate concern for the protection of the attorney-client privilege and the work product privilege; however, the Court nonetheless believes that many, if not most, of the daily entries presented lack sufficient detail in their description of legal services to permit the Court to fairly evaluate the measure of time devoted to identifiable issues addressed and the work performed. The amended applications, like those submitted in the first instance, are replete with non-informative, meaningless entries listing telephone calls to, and/or meetings with, co-counsel and/or other individuals without reference to and/or meaningful explanation of the purpose for the call or meeting, its relevance or materiality, the issues discussed, or other pertinent necessary information from which the Court can formulate a considered evaluation as directed by *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. These same comments apply equally to time schedules prepared by experts employed to assist counsel.

Judging the instant fee applications against the dictates of *Hensley* and its progeny, this judge's personal experience in assessing the value of attorneys' fees during more than forty-seven years of active legal practice, his personal observations and experience from presiding over this proceeding and in his researching the issue of student assignments and other controversies confronting the parties in this litigation during the last eighteen months, together with assessing the observations and comments of the Court's Legal Advisory Committee (Appendices E and E–1), which has reviewed the applicants' initial and amended fee applications, and because the applicants have accrued and recorded committed hours of service in ambiguous half-hour (30–minute) increments, a practice that defeats an effective review of their submissions for redundancy, duplication of effort, and necessity for the services performed, and severely complicates correlation of the fee schedule line entries, concludes, for the second time, that applicants have not satisfied their burden of proof imposed by *Hensley* or *Johnson*, nor have they satisfied the lesser burden of providing applications with sufficient detail or explanation to permit this Court to make a fair meaningful evaluation whether the time expended was not excessive (as it appears to be); that the services were not redundant nor a duplication of effort which, in many instances they appear to be; and that the services performed were necessary. All of these shortfalls of proof were brought to the attention of the applicants in this Court's decision of December 29, 1995. For the reasons stated herein, this Court accordingly reduces the time submissions of Atkins and Hardiman by a factor of twenty percent (20%) and the fee submissions of Whitaker by fifty percent (50%).

█ In reviewing the incurred personal expenses submitted by the individual applicants, the Court concludes that:

1. the personal expenses and costs submitted by Atkins in the amount of $3,401.04 are approved;

2. the personal expenses and costs submitted by Green in the amount of $1,595.00 are disallowed for the reason that there is no supporting explanation nor documentation for the said incurred expenses;

3. the personal expenses and costs submitted by Hardiman in the amount of

$386.00 are disallowed for the reason that there is no explanation nor supporting documentation for the said expenses; and

4. the personal expenses and costs submitted by Whitaker in the amount of $427.99 are disallowed for the reason that there is no explanation nor supporting documentation for the said expenses.

For the reasons stated herein, the Court concludes that all three of the applicants have individually failed to prove by a preponderance of the evidence entitlement to the payment they seek. Applicants have not only failed to support their claims in the amount they seek by a preponderance of the evidence, they have been unable to satisfy the less demanding burden of submitting applications that could permit a neutral judge to identify distinct claims, specify the issues addressed, assess participation of multiple counsel, and distinguish between redundant, unnecessary and duplicated work effort versus the proper utilization of time.

Accordingly, the Court authorizes the following fees to:

| Claimant | Hours Approved | Hourly rate Approved | Total Fees Allowed | Interim Fees Awarded | Expenses Allowed | Total Balance Due |
|---|---|---|---|---|---|---|
| Mr. Atkins | 294.2 | $187.00/hr | $ 55,015.40 | $42,133.68 | $3,401.04 | $ 16.282.76 |
| Mr. Hardiman Pre 1/1/94 | 424.6 | $175.00/hr | $ 74,305.00 | see total below | $ 0.00 | see total below |
| Mr. Hardiman Post 1/1/94 | 654.6 | $187.00/hr | $122,410.20 | see total below | $ 0.00 | see total below |
| Mr. Hardiman Total | 1079.2 | rate varied see above | $196,715.20 | $87,926.47 | $ 0.00 | $108,788.73 |
| Mr. Whitaker | 318.125 | $110.00/hr | $ 34,993.75 | $33,388.86 | $ 0.00 | $ 1,604.89 |
| Mr. Green | 367.60 | $ 75.00/hr | $ 27,570.00 | $12,019.17 | $ 0.00 | $ 15,550.83 |

Two of the submitted fee applications are inexcusably untimely, seeking fees for services performed by Hardiman and Whitaker during 1992, and which fail to reflect informative entries from which the Court can properly evaluate the work performed, can determine if the work performed was redundant, unnecessary and/or duplicated work effort or represented proper utilization of time, and/or whether time charged was essential to the litigation.

In the future, to ensure a uniform procedure from which the Court will be capable of conducting the above evaluations, all fee applications will be submitted semi-annually. Submissions seeking fees for services performed between January 1 and June 30 of a calendar year shall be filed with the Court by not later than July 31 of that year. Submissions seeking fees for services performed between July 1 and December 31 of a calendar year shall be filed with the Court by not later than January 31 of the following calendar year.

Court approved fees for any given reporting period shall be reduced by five percent (5%) for each week or part thereof that the fee schedules are out of rule with the filing dates hereinbefore ordered.

IT IS SO ORDERED.

### APPENDIX A

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO EASTERN DIVISION

[Filed August 29, 1995]

*ORDER*

KRUPANSKY, Circuit Judge, Sitting by Designation.

Pursuant to 42 U.S.C. § 1988, the Court is charged with the authority and responsibility of reviewing and, within its discretion, awarding reasonable attorneys fees to the prevailing party in "any action or proceeding

to enforce a provision of §§ 1981, 1981(a), 1982, 1983...."

The financial crisis confronting the Cleveland School System that has virtually eviscerated the Court's ability to implement its desegregation Remedial Orders, coupled with the System's burden to fund ongoing legal services necessary to resolve a myriad of controversies, including its position in *Reed v. Rhodes, et al.*, requires the Court to have access to reliable information from a credible and independent source that will accurately disclose the scope of legal and other expenditures that may impact the financial recovery of the District, so that the Court may readily assess the overall effect of those legal expenses upon its implementation of various Remedial Orders and to determine the need, if any, for additional remedies.

A cursory examination of past fee submissions and payments to special counsel having reflected a disparity,[1] the Court finds that an advisory legal commission would be of invaluable service to the Court in responding to its responsibilities.

Accordingly, Richard Alston, Director of the Office on School Monitoring and Community Relations (Attachment A), James W. Barnhouse (Attachment B), Dale F. Kainski (Attachment C), and William R. Norton (Attachment D) are appointed to serve as a Legal Advisory Commission to advise the Court in the exercise of its responsibility to review and determine if future legal fees and expenses charged to the defendants Cleveland School District and the State of Ohio Board of Education for services rendered in *Reed v. Rhodes*, by prevailing counsel, are fair, reasonable, and consistent with customary practices in the legal process in this community and in compliance with the dictates in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), as adopted by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The Commission shall, in addition to the foregoing, oversight all special counsel retainers, contracts, assignments, all commitments incident thereto according to the above-defined standards, and perform such other acts as the Court may, from time to time, request. Its observations and recommendations shall be made available to the Cleveland School District's General Counsel and to the State of Ohio Board of Education Superintendent of Instruction, its duly designated deputy, and its legal counsel, upon request.

The commission shall, as a public service, perform its assignment as a *pro bono* service at no charge to the Court or to the litigants. All reports and/or recommendations generated by the committee will be treated with confidence and be reported to the Office on School Monitoring and Community Relations.

IT IS SO ORDERED.

### ATTACHMENT A

Office on School Monitoring and
Community Relations

511 Terminal Tower ● Cleveland, Ohio 44113 ● Phone (216) 522–7300 ● FAX (216) 522–7305

41596

082995

### VITA

Richard Alston

Richard Alston is the Director for the Office on School Monitoring and Community Relations. The Office was created by federal court order to monitor desegregation of the

---

1. H.B. 117, *State Government—Budget—Appropriations*, 1995 Ohio Laws File 28, § 25 (effective July 1, 1995) invests the State of Ohio Auditor with unprecedented authority to immediately initiate and conduct a performance audit of the Cleveland City School System, which, in all probability, will include a review of its Office of Legal Counsel, its in-house legal resources, its past practices and procedures employed to retain special counsel, to determine hourly rates and/or fixed fees, monitor, review and approve fee submissions and all matters incidental thereto. The State performance audit will more thoroughly explore the areas of administration that motivated the Court's impressions that resulted from its perusal of the limited available documents within its possession.

Cleveland Public Schools. He graduated in 1973 from Case Western Reserve University with a Bachelor of Science degree in Chemistry. From 1973 to 1974, he was the science instructor at the Street Academy, an alternative high school operated by the Urban League of Cleveland. From 1974 to 1976 he was employed as a Senior Chemist for the City of Cleveland. In 1978 he received his degree from the Cleveland–Marshall College of Law. During his studies at Cleveland–Marshall, he participated in the Street Law Program, which included teaching at Cleveland's East Technical High School. In 1979 he began work with the Office on School Monitoring where he has participated in the development of many reports, lectured and conducted workshops for the community. In 1988 he became Deputy Director of the Office on School Monitoring. Since that time, along with continuing his other former activities he has assisted in bringing the various interests together in the Cleveland desegregation case. He and his wife Denise Cameron have two children.

"Observe, assess and report on the progress of the desegregation of the Cleveland Public Schools and ... foster public awareness and understanding of the desegregation process."

Order of U.S. District Court May 4, 1978

41934

RICHARD ALSTON

3963 Tennyson Lane
North Olmsted, OH 44070

*EXPERIENCE AND EMPLOYMENT:*
Currently Director for the Office on School Monitoring and Community Relations. Appointed to this position on June 1, 1995. Prior positions: Acting Director October 1994 to May 1995; Deputy Director 1988 to 1994; Administrative Assistant and Special Assistant from 1979 to 1988.

Instructor at the Cleveland House of Correction. Instruct residents of the House of Correction in basic criminal and correctional matters. April 1978 to 1979.

Assistant social service worker at Cuyahoga County Jail. Assist inmates in research of legal matters. October 1977 to April 1978.

Law library reference desk aid. Locate legal materials for students and lawyers. June 1976 to October 1977.

High School law instructor. Worked within the National Street Law Program instructing high school students in legal fundamentals. October 1976 to June 1977.

Senior Chemist with the City of Cleveland Water Quality Control Program. March 1974 to March 1976.

Science instructor at the Urban League Street Academy. Taught high school level courses in general science, biology, and chemistry. August 1973 to March 1974.

*EDUCATION:* Cleveland Marshall College of Law, Cleveland, Ohio. Acquired Juris Doctor Degree in 1978. Admitted to the Bar in 1979.

Case Institute of Technology (CWRU), Cleveland, Ohio. Acquired Bachelor of Science Degree in Chemistry in 1973.

James Monroe High School, New York, N.Y. Graduated 1969.

*PERSONNEL:* A special interest of mine is legal education at the community level. An objective of mine is to provide basic legal information as a community service. Much of my legal training has been geared toward this objective.

Born April 23, 1951 in the Bronx, New York. Married to Denise Cameron. Two children, Aaron and Taylor, ages 8 and 6 respectively.

**ATTACHMENT B**

**CURRICULUM VITAE**
**James W. BARNHOUSE**

## PERSONAL

Born Canton, Ohio—September 14, 1942
Admitted to Bar— Ohio, 1967
 Arizona, 1991

## EDUCATION

Ohio State University—B.A. 1964, J.D. 1967
 Phi Delta Phi

## PRACTICE

Kitchen, Deery & Barnhouse—1973– )
 (Managing Partner 1992– )

## COURTS

Ohio 1967—
United States District Court, Northern District of Ohio 1974—
United States Court of Appeals Sixth Circuit 1983—
United States Supreme Court 1983—
Arizona 1991—
United States District Court, District of Arizona 1994—

## ASSOCIATIONS

Cleveland Bar Association

Ohio State Bar Association
 Member— Legal Education Committee

State Bar of Arizona

American Bar Association
 Member— Section of Tort and Insurance Practice
 Products, General Liability and Consumer Law Committee
 Economics of Tort and Insurance Law Practice Committee
 Self–Insurers and Risk Managers Committee
 Member— Section of Litigation
 Products Liability Newsletter—
 Quarterly Contributing Editor

Federal Bar Association
 Member— Energy, Environment and Natural Resources Committee
 Member— Federal Litigation Committee

Defense Research Institute, Inc.

Ohio Association of Civil Trial Attorneys
 Member— Insurance Relations Committee

Cleveland Association of Civil Trial Attorneys

International Association of Defense Counsel
 Member— Products Liability Committee

Federation of Insurance and Corporate Counsel
Member— Economics of Trial Practice Committee Alternative Dispute Resolution
Committee Products Liability Committee

International Association for Insurance Law
United States of America Chapter

## EXPERTISE

Emphasis of practice in product liability/toxic tort defense, as well as construction litigation, insurance and automobile law, and professional liability.

---

ATTACHMENT C

**DALE F. KAINSKI** PARTNER
BURKE KAINSKI & VAN BUREN
A LEGAL PROFESSIONAL ASSOCIATION

### EDUCATION
Notre Dame Law School
Juris Doctor 1975
Bowling Green State University
B.S. Business Administration
Accounting 1972

### COURT ADMISSIONS
Ohio Supreme Court, 1975
U.S. District Court, N.D. Ohio, 1975
U.S. 6th Cir. Court of Appeals, 1977
United States Supreme Court, 1979

### PRIOR EMPLOYMENT EXPERIENCE
Arter & Hadden
Associate Attorney
1986–1991
Chief Counsel
City of Cleveland
Department of Law
1983–1986
Assistant U.S. Attorney, N.D. Ohio
U.S. Department of Justice
1978–1983
Law Clerks Deputy Clerk of Court
Judge Robert B. Krupansky
U.S. District Court, N.D. Ohio
1975–1978

### PROFESSIONAL EXPERIENCE
Trial and Appellate Practice in the
State and Federal Courts
and Administrative Agencies
Commercial Transactions and Litigation
Building Construction Transactions
and Litigation
Corporate and Business Transactions
and Litigation
Civil Rights Litigation
Employment Discrimination
Police Misconduct
Zoning Discrimination
Government Litigation
Real Property Transactions and Litigation
Intentional and Negligent Torts

### HONORS, ACTIVITIES AND OFFICES HELD
Special Achievement Award, 1981
United States Attorney General
Sustained Superior Performance
Instructor, U.S. Attorney General's
Advocacy Institute, 1982
Member, Ohio State Bar Association
College, 1992–94
Beta Gamma Sigma
Business Honorary Society
Delta Sigma Pi
Professional Business Fraternity
Notre Dame's London Centre
for Legal Studies
Notre Dame Club of Cleveland
Past President

### PROFESSIONAL ASSOCIATIONS AND OFFICES HELD
Life Member, Judicial Conference
United States Sixth Circuit
Life Member, Judicial Conference
Ohio Eighth Appellate District
Federal Bar Association
Past National 6th Circuit Vice President
Past Chairman, Younger Lawyers Division
Past Chairman, Long Range Planning
Past Member, Executive Committee
Past Member, National Council
Past President, Cleveland Chapter
Past Director, Cleveland Chapter
American Bar Association
Ohio State Bar Association
Akron Bar Association
Member, Federal Court Committee
Member, Local Government Committee
Cleveland Bar Association
Member, Federal Court Committee
Member, Business Litigation Committee
Cuyahoga County Law Directors Association
Delta Theta Phi Law Fraternity

**BURKE, KAINSKI & Van BUREN**
A LEGAL PROFESSIONAL ASSOCIATION
I CASCADE PLAZA—10TH FLOOR AKRON, OHIO 44308 1111
TELEPHONE (216) 762–9500 FACSIMILE (216) 762–6008

## ATTACHMENT D

## WILLIAM R. NORTON
8815 Pheasant Lane
Kirtland, OH 44094
(216) 258–3258

### SUMMARY

- Vice President, General Counsel and Secretary of Reliance Electric Company, a $1.8 billion, NYSE manufacturing company with manufacturing facilities throughout the world.

- Managed eight lawyer department with a total budget of approximately $4 million annually. Continually reduced outside legal costs, despite increasing workloads.

- Introduced a number of new systems and procedures to the Company's Law Department to enhance quality and efficiency while reducing costs.

- Served as a member of the Company's Management Committee for the past five years.

- Served as a member of various committees, Secretary to the Board of Directors and the Audit Committee.

- Managed the acquisition and divestiture of a number of companies and negotiated various joint ventures.

- Provided legal guidance and was responsible for all legal aspects of the Company's leveraged buyout, numerous large financing, stock issues, NYSE listing, taking the Company public and the sale of the Company through a negotiated merger which was successfully challenged by a hostile tender offer from Rockwell International.

### EMPLOYMENT HISTORY

- 1991–1995 Vice President, General Counsel and Secretary—Reliance Electric Company
- 1984–1991 Assistant General Counsel and Assistant Secretary—Reliance Electric Company
- 1976–1984 Corporate Counsel—Reliance Electric Company
- 1971–1976 Corporate Counsel—White Motors Corporation
- 1968–1971 U.S. Army, Special Forces (Airborne) Ft. Bragg, NC.

### EDUCATION

- 1965 JD—Case Western Reserve University
- 1966 BA—Hiram College (History, Political Science)

## APPENDIX B

## UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO EASTERN DIVISION

[Filed December 29, 1995]

### ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation.

Pursuant to 42 U.S.C. § 1988, the Court is charged with the authority and responsibility of reviewing and, within its discretion, awarding reasonable attorneys fees to the prevailing party "in any action or proceeding to enforce a provision of §§ 1981, 1981a, 1982, [or] 1983. . . ."

Before the Court is the application of plaintiffs' counsel Thomas I. Atkins of New York, New York, for legal services performed between the dates of 7/6/94–8/4/95 at a rate of $340.00/hour for a total of $126,-401.04, plus out-of-pocket costs and a fee submission for the consultation services of a Dr. Robert L. Green at $75.00/hour for an additional $36,057.50 for an aggregate of $162.458.54; the application of James L. Hardiman of Cleveland, Ohio for legal services performed between 3/2/92 through 12/28/92 at $175.75/hour for a total of $20,256.25, 1/7/93 through 12/22/93 at $175/hour for a total of $73,587.50, 1/6/94 through 12/30/94 at $200/hour for a total of $119,550.00. 1/3/95 through 8/31/95 at $225/hour for a total of $50,006.25 with out-of-pocket expenses of

$386, for an aggregate of $263,786.00; and the application of David W. Whitaker of Beachwood, Ohio from 5/no date/90 through 11/21/92 (no supporting documentation for that period of time reflecting an hourly rate or number of hours committed), 11/22/92 through 12/28/92 at a rate of $160/hour with no total amount listed, for the period between 1/7/93 and 12/22/93 at $160/hour with no total amount listed, for the period between 1/14/94 and 12/27/94 at $160/hour with no total amount listed, for the period 1/8/95 and 9/1/95 at $160/hour with no total amount listed, for a total of $102,307.99, plus out-of-pocket expenses of $427.00, for an aggregate of $102.734.99, or a grand total for all plaintiffs' counsel of $528,979.53.

Subsequent to the above fee submissions, plaintiffs' counsel jointly filed a pleading styled a Motion for an Interim Award of Fees and Costs, with supporting briefs. The motion seeks an interim payment of fees and costs to Thomas I. Atkins in the amount of $63,200.52, plus $18,028.75 to Dr. Robert L. Green, his consultant, for a total of $81,-229.27; to James L. Hardiman in the amount of $131,893.00; and to David W. Whitaker in the amount of $51,153.95.

At the outset, the Court, aware of existing legal precedent, recognizes its discretionary authority to award *reasonable* interim attorneys fees to a *prevailing party* in a 42 U.S.C. § 1983 action arising from infringements of protected constitutional rights.

The burden placed upon the Court by 42 U.S.C. § 1988 is a heavy one, particularly within the context of the instant case. In exercising its discretion in this highly controversial area, the Court must be ever mindful of fundamental principles that ensure fair, impartial, and equitable treatment of all interested parties, including their legal counsel.

Initially, it should be noted that the Court subscribes to and endorses the concept that the plaintiffs and all defendants, the State of

Ohio Board of Education, the City of Cleveland School District, and the Cleveland Board of Education should be free to retain the most qualified available legal talent of their own choice without interference by the Court. The Court also subscribes to and endorses the universally adopted admonition of the Supreme Court and the circuit courts that have addressed the issue of awarding legal fees in a desegregation case that defines reasonable attorneys fees as "fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." *Hensley v. Eckerhart,* 461 U.S. 424, 431 n. 4, 103 S.Ct. 1933, 1938 n. 4, 76 L.Ed.2d 40 (1983). More specifically,

> [t]o put these guidelines [the 12 *Johnson* factors] into perspective and as a caveat to their application, courts must remember that they do not have a mandate under Section 706(k) [of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) ] to make the prevailing counsel rich. Concomitantly, the Section should not be implemented in a manner to make the *private attorney general's position so lucrative as to ridicule the public attorney general.* The statute was not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical [sic] burden of Title VII litigation. Adequate compensation is necessary, however, to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession. The guidelines contained herein are merely an attempt to assist in this balancing process.[1]

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 719–20 (5th Cir.1974); *see also Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974); *aff'd,* 550 F.2d 464 (1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Swann v. Char-*

---

1. In the instant proceeding, Special Counsel, of equal competence and longevity, appointed by the State of Ohio Attorney General to represent the defendant State of Ohio Board of Education and its Superintendent of Instruction, is compensated at a rate of $95.00 per hour accrued in tenth of an hour (or six-minute) increments, as compared to a $340.00 per hour rate accrued in half-hour (30–minute) increments, as proposed by plaintiffs' New York counsel, and $160.00 to $200.00 per hour accrued in 15–minute increments, as proposed by local counsel.

*lotte–Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975).

*Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937, also dictates that "[t]he amount of the fee, of course, must be determined on the facts of each case." This statement does not lighten the Court's burden in the case at bar but rather poses a material obstacle in pursuing a resolution because, on March 3, 1995, when the Cleveland School District was placed under the supervision of the Ohio Board of Education and its Superintendent of Instruction by this Court (a copy of its Order is attached for convenience as Appendix A), it was and continues to be hopelessly *bankrupt.* It had exhausted its half billion dollar annual budget, was confronting a shortfall of $30,000,000, and was in need of an immediate loan in that amount, which it was unable to negotiate. It required the funds to meet daily operating expenses and payroll until June 30, 1995 (the end of its fiscal year) because it had, during the 3½ short years immediately preceding the March 3, 1995 court order, escalated its indebtedness from $35 million to a staggering and irreversible $140 or more million as a direct result of politicized mismanagement.[2]

Although the fiscal condition of the District does not directly impact counsel's right to an award of reasonable attorneys fees, and this Court excludes that consideration in arriving at a reasonable fee allowance, it recognizes, however, that every dollar of an excessive fee award is a dollar diverted from the education of the District's student enrollment and from the Court's ability to efficiently and effectively implement its various remedial orders. Thus, in the instant case, the fiscal condition of the District is material only to emphasize the necessity for a more scrutinizing review of legal fee submissions.

The Court has read with interest the briefs of plaintiffs' counsel in support of their joint petition for interim fee awards which imply that *Northcross v. Board of Education of Memphis,* 611 F.2d 624, 641 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) is in conflict with, and overrides, at least in this circuit, the "*Johnson* factors" enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). Counsel misinterpret the pronouncements of those cases. Contrary to counsel's implications, the twelve "*Johnson* factors"[3] are consistent with those recommended by the American Bar Association's Code of Professional Responsibility, Ethical Consideration 2–18, Disciplinary Rule 2–106. They are not inflexible elements to be rigidly applied in deriving a reasonable fee award. They are exactly what they purport to be, namely, *guidelines* to be considered along with all other factors that have evolved in common law and the exercise of experience and sound judgment. The Sixth Circuit's rationale in *Northcross* merely amplified the application of the *Johnson* guidelines with-

---

**2.** During the same time frame (1993–94), the student daily absentee rate in grades 9 through 12 increased to 29% (from Cleveland Public Schools Report: "Attendance Rates 1989–90 through 1993–94"); the cohort student dropout rate in grades 10 through 12 rose to 35% (from District Periodic Status Report (PSR) Specification 2b); the 9th to 10th grade non-promotion rate was 42% of the total enrollment of those grades, which rate rose to 61% by the end of the 1994–95 school year in June of 1995 (from Cleveland City School District 2A–Promotes/Nonpromotes Annual Report(s) for Academic Year(s) 1993–94 and 1994–95); the 10th to 11th grade non-promotion rate was approximately 32%, which rose to 38% by the end of the 1994–95 school year in June, 1995 (*Id.*); the 11th to 12th grade non-promotion rate was approximately 26%, which non-promotion rate rose to 31% by the end of the following school year in 1995 (*Id.*); and demonstrated student proficiency (predicated upon the results of the March, 1995 4th grade proficiency test) of Ohio large urban school dis-

tricts reached the lowest level in the state (from Cleveland Public Schools Report: "Fourth Grade Proficiency Test Results," 6/28/95).

**3.** The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–19. These factors derive directly from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106.

out conflict. However, assuming *arguendo,* the existence of conflict between the dispositions, the Supreme Court adopted the "12 *Johnson* factors" in *Hensley,* in 1983, five years after the Sixth Circuit 1979 decision in *Northcross.* The pronouncements of *Hensley* and its progeny, accordingly, became and remain the prevailing precedent addressing the issue of § 1988 fee awards.

The responsibility of the trial court in awarding fees in cases of this kind is a thankless one because it is necessarily called upon to question the time, expertise, and professional work effort of lawyers appearing before it, which is difficult and distasteful. In all probability, its decision will be totally unsatisfactory to all concerned.

The trial judge's burden to conserve and protect the School District's revenues has, at least to some degree, been lightened by the findings, conclusions, and mandates of the Supreme Court expressed with clarity and precision by Justice Stevens in *Hensley.* This Court accepts the direction of *Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40 that counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client *within the venue of the litigation,* for all time *reasonably* expended on a matter. As nearly as possible, *market standards within the community of the action should prevail,* for that is the best way of ensuring that competent counsel will be available to all persons with bona fide civil rights claims. In *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 718, the Fifth Circuit stated:

> The customary fee for *similar work in the community* should be considered. It is open knowledge that various types of legal work command differing scales of compensation.... (Emphasis added).[4]

Present legal precedent recognizes that a prevailing applicant seeking *fees bears the burden of proving entitlement to an award* by contemporaneously documented records of the hours expended and the hourly rate applied. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. Although a fee submission is not required to record in great detail how each minute of time was expended in order to carry the assigned burden of proof, an applicant should maintain accurate contemporaneous time records in a manner that will enable a reviewing court to identify *distinct claims,* identify issues addressed, justify the participation of multiple counsel, and distinguish between redundant, unnecessary, and duplicated work effort and proper utilization of time.[5] An applicant's failure to keep records identifying distinct claims in sufficient detail from which a neutral judge can make a fair evaluation of time expended, the nature and need for the service, and the reasonable fee to be allowed may materially jeopardize the amount of the award.

---

4. Prevailing current market standards within the greater Cleveland community for similar services is reflected by a broad spectrum of actual hourly rates charged by various Special Counsel in the instant proceeding to address common issues arising in ongoing controversy:

 a). Squire, Sanders & Dempsey 
 b). Hogan & Hartson
 c). Teamor, Thompson & Associates

Accordingly, without justification to the contrary, and with reference to the actual legal fees charged by qualified lawyers and recognized legal firms within the greater Cleveland area to address the common issues of this case, the Court determines the lode star prevailing fair and reasonable rate for legal services performed to address the issues and controversies common to this desegregation action in this community to be $175.00 per hour, but no greater than $200.00 per hour, to be accrued in tenth of an hour (or six-minute) increments.

1. Special Counsel for the State of Ohio Board of Education and its Superintendent of Instruction is paid a rate of $95.00 per hour by the State of Ohio Attorney General;

2. Special Counsel for the Cleveland Board of Education charge the following rates:

 $187.00 per hour
 $165.00 per hour
 $145.00 per hour.

5. Commenting on an applicant's failure to carry his assigned burden of proof, the Supreme Court stated:

> "we would not view with sympathy any claim that a district court *abused its discretion in awarding unreasonably low attorneys fees* in a suit in which plaintiffs were only partially successful if *counsel's records* do not prove a proper basis for determining how much time was spent on particular claims." *See Hensley* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12 (citation omitted) (emphasis added).

This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."

*Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40 (*citing Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc*) (emphasis the *Copeland* court's)).

The Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974) noted that:

Although hours claimed or spent on a case should not be the sole basis for determining a fee [citation], they are a necessary ingredient to be considered. The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities. *If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted. It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can* often *be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.* (Emphasis added).

Commenting on other American Bar Association guidelines, the Fifth Circuit observed that:

The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration.

*Johnson,* 488 F.2d at 718.

Assessing the novelty and difficulty of issues involved, The *Johnson* court recognized that:

Cases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may "make new law."

*Id.*

With the exception of the most recent landmark disposition in *Jenkins v. Missouri* [*Missouri v. Jenkins*], —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), the evolution of desegregation law from *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) to the present, reflects that most, if not all, of the issues of first impression which initially attached to those cases were decided by various circuits throughout the nation and by Supreme Court dispositions a number of years ago. Remaining cases in controversy are indigenous to local community school districts and require the attention, legal perception and understanding of local counsel who are members of the community and who are sensitive to the voice of the community from first hand personal observations.

Apart from providing a historical background of a proceeding, in today's world of computers the legal expertise previously as-

sociated with longevity in any given desegregation action is virtually instantaneously available to counsel by activating an appropriate computer key and accessing either Lexis or Westlaw for the evolution of legal precedent addressing any issue in controversy.

It is true that plaintiffs, in the instant action, were initially successful in their efforts which resulted in the late Judge Battisti's February 6, 1978 remedial order. Although this Court was not privy to his subsequent remedial orders, it assumes that plaintiffs were equally successful in "substantially advancing their clients' interests" by obtaining "significant concession[s] from the defendants" as a result of prosecuting the merits of each of those successive actions on their individual merits. *Hensley*, 461 U.S. at 430–31, 103 S.Ct. at 1938. Nor does the Court question the success of the applicants in influencing, at least to some degree, the consent order dated May 16, 1995, which it approved. However, past successes, for which counsel have been paid, do not necessarily embrace all successive future issues that may arise during the implementation of a remedial order entered twenty three or more years ago.

In seeking fee awards payable from a common taxpayers' desegregation fund (Desegregation Fund # 12), as in the instant ongoing legal proceeding, plaintiffs' and defendants' counsel alike have a responsibility to exercise "billing judgment" in drafting fee submissions arising from successive interpretations and/or implementations of the seminal remedial order and its progeny within the "prevailing party" concept. Because there is no precise rule or formula for making these determinations, the product of hours reasonably expended in pursuing successive ventures, the reasonable hourly rate to be applied, the justification for multiple attorney participation, and the degree of success, if any, achieved are elusive factors in evaluating the reasonable worth to be assigned to those efforts.

It would appear from *Hensley* that, to qualify as a "prevailing party" seeking relief arising from successive interpretations and implementations of the seminal remedial order, subsequent successive action undertaken by applicants must address a "substantial" claim which, through the efforts of the applicants, has advanced their clients' interests by obtaining *significant concessions* from the defendant.

For example, in the instant case, the Court expresses great concern as to the need and justification for *multiple counsel* and/or *multiple firms* to monitor compliance with court remedial orders, the time and duplication of effort expended, and the hourly rate applied to those ongoing monitoring services.

In considering the impact of the "prevailing party" doctrine, the Court and counsel should be mindful of the Supreme Court's findings in *Hensley* that:

If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. *Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill.* Again, the most critical factor is the degree of success obtained.

Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. In this case, for example, the District Court's award of fees based on 2,557 hours worked may have been reasonable in light of the substantial relief obtained. But had respondents prevailed on only one of their six general claims, for example the claim that petitioners' visitation, mail, and telephone policies were overly restrictive, see

n. 1, *supra*, a fee award based on the claimed hours clearly would have been excessive.

There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

*Id.* 461 U.S. at 436, 103 S.Ct. at 1941 (emphasis added).

In *Kelley v. Metropolitan County Bd. of Education*, 773 F.2d 677 (6th Cir.1985), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986) an *en banc* panel of the Sixth Circuit applied *Hensley* in a context similar to this case. In *Kelley*, the lower court awarded attorneys fees to plaintiffs "for time spent [on] unsuccessful charges of contempt against the Board, yet unresolved matters as to faculty composition, and their efforts to keep Pearl High School open." *Id.* at 685 n. 7. In reviewing the propriety of these awards, the *Kelley* panel remanded the case to the lower court to "follow the mandate of *Hensley* to determine which claims plaintiffs have succeeded upon and those which they have not, and to calculate the attorneys' compensable hours accordingly[.]" *Id.* at 686. After *Hensley*, the *Kelley* panel directed, "a party's request for attorney's fees [should] be carefully scrutinized as to the extent of success on each claim, and further, that time spent on unsuccessful claims that are distinct from successful claims should be excluded in determining a reasonable fee." *Id.* at 685.

This review of the *"Johnson* factors," together with the Supreme Court's dictates in *Hensley* and the Sixth Circuit's pronouncements in *Kelley*, merely serve to highlight the importance of incorporating contemporaneously recorded evidence supporting a fee application from which a court may glean meaningful information to exercise an informed judgment in arriving at an equitable fee award.

Additionally, because the fees paid to multiple law firms representing the defendant School District were and are payable from a common public fund (Desegregation Fund # 12) [6] with those paid to plaintiffs' counsel, and because any excessive award of funds to the School District's counsel likewise diverts funds more properly used to educate the students in the District and impairs this Court's implementation of the remedial orders, the guidelines of this Order apply with equal force to the fee applications of counsel for the District.[7] Accordingly, at least at

---

**6.** Special Counsel appointed by the State of Ohio Attorney General to represent the State of Ohio Board of Education and its Superintendent of Instruction are paid from State funds and not from the City of Cleveland School District's revenues. Consequently, these payments do not reduce funding more appropriately allocated to student educational efforts.

**7.** A cursory review of payments authorized by Cleveland Board of Education resolutions to its legal counsel and paid from Desegregation Fund # 12 during the fiscal year 1994 and between the period of 2/23/95 and 6/23/95 reflect what appears to be a total disregard for the Supreme Court's admonitions and dictates expressed in *Hensley*.

For example, during the fiscal year 1993–94, the Cleveland Board of Education paid, without objection, fee schedules submitted by Squire, Sanders & Dempsey in the amount of $376,-156.81, Hogan & Hartson of Washington, D.C.—$280,580.46, and Teamor, Thompson & Associ-

ates—$258,522.89, for a total of $915,260.60 (from the Office on School Monitoring and Community Relations calculation based on Cleveland Board of Education Resolutions passed during fiscal year 1993–94). The above payments were approximately three times greater, or approximately 300%, than the fees paid to plaintiffs' legal counsel or the fees paid to the State Board of Education's legal counsel for addressing the same issues and controversies arising during the same time period.

It also appears that $243,888.35 of $297,-681.70 paid to Squire, Sanders & Dempsey for the period between 2/3/95 and 6/23/95, and $127,672.59 of a $198,730.11 fee paid to Teamor, Thompson & Associates for the same period, were paid without review or resort to determining compliance with the Supreme Court's mandates in *Hensley*. Moreover, the payments were authorized by invalid Board resolution enacted after this Court's Order of March 3, 1995, and must, accordingly, be reassessed and approved by the State Board of Education for compliance with *Hensley* and this Order.

this juncture, the fee applications of the District's counsel will be monitored by the Office on School Monitoring and Community Relations for compliance with the dictates of this Order and the mandates of the Supreme Court in *Hensley*.

Because the fees paid to all counsel in this case flow from taxpayer funds, the *amount* of fee awards should be a matter of public record. Also, the fee applications themselves will be presumed to be a public record, unless a party invoking the "work product" or "privileged communication" doctrines has justified the assertion.

Unfortunately, the Court is unable to evaluate the merits of the instant fee applications of plaintiffs' counsel since they do not incorporate sufficient necessary detail to permit an assessment within the guidelines of *Johnson* and the dictates of *Hensley* because those applications, some of which are inexcusably untimely and which seek fees for services rendered in 1990, fail to reflect information from which the Court can identify the issues addressed, justify participation of multiple counsel, distinguish between redundant, unnecessary and/or duplicated work effort and proper utilization of time, and/or whether time charged was essential to the litigation.

For the above reasons, in the interests of fairness to applicants and their retained consultants, these parties shall be afforded an opportunity to revisit their fee applications with the following observations in mind:

1. Recognizing a legitimate concern for the protection of the attorney-client privilege, the Court nonetheless believes that many, if not most, of the daily entries presented lack sufficient detail in their description of legal services to permit it to fairly evaluate the measure of time devoted to identifiable issues addressed and the work performed. The applications are replete with non informative, meaningless entries listing telephone calls to and/or meetings with co-counsel and/or other individuals without reference to and/or meaningful explanation of the purpose of the call or meeting, its relevance or materiality, the issues discussed or other pertinent necessary information from which the Court can formulate a considered evaluation as directed by *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. The same comments apply with respect to time charges prepared by experts employed to assist counsel.

2. The Court does not believe that it is the usual and customary billing practice in the legal community where this lawsuit is venued to charge for time in half or quarter hour increments, as reflected in these fee applications. For example, a two, three or five-minute telephone conversation between plaintiffs' New York counsel, who conducts his legal practice primarily, if not exclusively, by telephone from his apartment in New York City, and who seeks an hourly rate of $340.00 calculated in half hour increments, and one of his two co-counsel in Cleveland, Ohio, who seeks an hourly rate of $200.00 calculated in quarter hour increments, results in a charge to the School District of $220.00. If the same telephone call includes a second Cleveland co-counsel, who seeks an hourly rate of $160.00, also calculated in quarter-hour increments, that two or three-minute telephone call is escalated to a charge of $260.00. That same three or four-minute telephone call calculated in six-minute increments or tenths of an hour, which is the general practice in the Cleveland legal community, would cost $70.00. As demonstrated, the incremental predicate upon which telephone charges are accrued rises to a high level of significance in the instant action because of the great volume of intra-telephonic communications between plaintiffs' co-counsel and the inter-telephonic communications between plaintiffs' counsel, individually and/or collectively, and other parties to this case, all of which are difficult to correlate and which emphasize the importance of maintaining contemporaneous records to support fee submissions. In the Court's experience, clients rightfully demand the reporting of time

charges in six (6) minute increments, *i.e.* tenths of an hour. The same comments apply with respect to time charges prepared by experts employed to assist counsel.

3. The interaction between incremental charges, hourly rates, and duplication of effort amongst an inordinate number of multiple intra-firm and/or inter-firm counsel representing the same plaintiff or defendant, as the case may be, exacerbates the precipitous mathematical progression which attaches to deriving a reasonable fee award for addressing a given controversy amplifies the Court's concern. The interaction of these elements, if not properly scrutinized, lends itself to inter-counsel and intra-firm networking, which could result in pyramiding fees. For example, if, on the same day, one law firm assigns two lawyers to consider an issue, each with a hypothetical hourly rate of $175.00, and they confer, the hourly rate becomes $350.00. If they, in turn, discuss the controversy with a member of the second firm with a hypothetical hourly rate of $160.00, the hourly rate increases to $510.00. If a second member of the second firm with the same hypothetical hourly rate enters the dialogue, the hourly rate is $670.00. If a member of the third firm with a hypothetical hourly rate of $145.00 is consulted, the combined hourly rate is escalated to $815.00, as compared to a $175.00 hourly charge if a single lawyer would have resolved the issue. Depending upon the hourly incremental billing practice, *i.e.* tenths of an hour or $81.50 on the high side as compared to $17.50 on the low side or $203.75 as compared to $43.75 predicated on a quarterly incremental hourly charge. Accordingly, the burden rests upon the multiple applicants to discount any semblance of the above alluded to interaction.

4. Although the Court recognizes the propriety of petitioning for compensation for time devoted to the preparation of fee applications under 42 U.S.C. § 1988, it does not believe standard billing practices to include compensation to attorneys for time devoted to the preparation and posting of time charges and the preparation of client invoices.

5. The Court also notes what appears to be some inconsistency in the daily time charges recorded by the attorneys. In some instances, for example, it observes different times posted for the same work performed by the respective attorneys who were apparently working together on the same matter on the same date. In other instances, the Court noticed that, while one attorney posted a time entry, others posted no time entry, even though the posted entry suggested that the attorneys were working together on the same matter on the same date.

6. In order to properly evaluate out-of-pocket expenses incurred by counsel, it is necessary not only to provide a detailed explanation of individual expenses, but to also furnish to the Court copies of invoices and receipts for each such expense. The same comments apply with respect to out-of-pocket expenses incurred by experts employed to assist counsel.

7. The Court is also concerned about the appropriateness of charging for meals.

8. The Court is also concerned about the need for multiple lawyers to address identical issues and the magnitude of the hourly rates employed by the respective attorneys, and questions whether they properly reflect the usual and customary rates employed in the greater Cleveland metropolitan area legal community where this lawsuit is venued. Likewise, it expresses some concern over the measure of the escalation of hourly rates from one year to the next, and whether those increases are consistent with the usual and customary escalation of rates employed in this legal community.

9. Finally, from the perspective of both the School District and the billing at-

torney, the Court does not believe that it is an accepted practice within the local community to accumulate unbilled fees and costs over extensive periods before fee bills are submitted. Charges dating back more than one year or, as in one instance here, in excess of 3½ years, are difficult, if not impossible, to evaluate without retrieving the required Court and School District's records, if they are available, and correlating the application with contemporaneously filed applications. Untimely filing also can severely impact the finances and significantly disrupt the budgetary planning of the District. Accordingly, in the future, all fee applications shall be submitted biannually.

From the foregoing observations, the Court concludes that, absent justification to the contrary, "the fee applicant bears the burden of establishing an entitlement to an award[.]" *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) and proving that:

1. The applicant has pursued a substantial claim on behalf of his client which has advanced the client's interests by obtaining significant concessions from the defendant, thereby satisfying the prevailing party doctrine defined by *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

2. The participation of multiple counsel or multiple firms is justified and has not resulted in a duplication of time and effort, and that the hours expended were not excessive, redundant, or otherwise unnecessary. *Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40; *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974).

3. The proposed hourly rate distinguishes between court appearances, non-court or other legal work, investigation, monitoring, clerical work, compilation of facts and statistics, and other work which can be accomplished by non-lawyers, which may command a lesser rate and which is not enhanced because it is accomplished by a lawyer. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40 & n. 9; *Johnson,* 488 F.2d at 717.

4. The proposed hourly rate is the prevailing reasonable hourly rate within the Cleveland metropolitan legal community for similar services addressing similar issues and/or controversies, recognizing that various types of legal services command differing scales of compensation. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940 & n. 9; *Johnson,* 488 F.2d at 718–19.

5. The proposed billable hours are not excessive. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40; *Johnson,* 488 F.2d at 717.

Accordingly, without justification to the contrary, the Court determines that from a review of the actual legal fees charged by qualified lawyers and recognized legal firms within the greater Cleveland area to address the common issues of this case, the lode star prevailing fair and reasonable rate for legal services performed to address the issues and controversies common to this desegregation action in this community to be $175.00 per hour with a maximum outside limitation of $200.00 per hour to be accrued in tenths of an hour or six-minute increments.

In the future, expert consultants, paid from public funds shall be retained upon application to and approval by the Court.

For the reasons aforestated, the fee applications are returned to counsel for reconsideration and resubmission by not later than January 30, 1996.

The Court also approves the following interim fees:

| | |
|---|---|
| Thomas I. Atkins | $42,133.68 |
| Robert L. Green | $12,019.17 |
| James L. Hardiman | $87,926.47 |
| David W. Whitacker | $33,388.86 |

IT IS SO ORDERED.

APPENDIX C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

[Filed March 3, 1995]

*ORDER*

KRUPANSKY, Circuit Judge, Sitting by Designation.

In recent weeks, the Court has monitored with increasing concern escalating controversy within the Cleveland School District (the District). The Court is particularly concerned that such controversy has affected the City of Cleveland Board of Education's (the Board) ability to administer its educational agenda and to achieve uninterrupted implementation of this Court's Remedial Desegregation Orders and the recently approved Consent Order designed to accelerate achievement of unitary status of the District and cessation of continuing judicial supervision. The culmination of this internal dissention was the resignation and departure from the city of the District School Superintendent on March 3, 1995, the date of this Order, shortly following the recent departures in January, 1995, of the District Deputy Superintendent of Educational Programs and Deputy Administrator for Support Services. Coupled with the above events, is the District's critical financial condition and its failure to secure the required support for its application to the State Board of Control for approval and authorization to negotiate a 29.5 million dollar emergency loan to meet its day-to-day operational costs for the remainder of the fiscal year ending June 30, 1995. The above concerns, along with additional information brought to the attention of the Court by the Office on School Monitoring and Community Relations, prompted the Court *sua sponte* to convene a hearing to determine if the Cleveland School District and its Board of Education are capable of uninterrupted implementation of the Court's Desegregation Remedial Orders and the Consent Decree entered into between the parties on 5/25/94.

a. $128,605,000 on June 30, 1994; projected to—
b. $144,540,000 on June 30, 1995;
c. $147,478,000 on June 30, 1996

A hearing was conducted on Friday, February 24, 1995 attended by all parties. From the statements of counsel, the evidence, and additional documentation from the Office on School Monitoring and Community Relations, the Court makes the following findings:

1. The District has virtually exhausted its roughly half billion dollar operating fund budgeted for the fiscal year ending June 30, 1995; and

2. The District is confronted with a projected shortfall of 29.5 million dollars for the balance of its fiscal year ending June 30, 1995;

3. The State Superintendent of Public Instruction (State Superintendent), to date, has refused to support the District's application to the State of Ohio Board of Control for authorization to seek a 29.5 million dollar loan because of the Board's refusal since October of 1994, to account for the status of approximately 40 million dollars advanced to the District by the State of Ohio during the 1994–95 fiscal year and the District's matching contribution in the same amount in compliance with the Desegregation Compliance Plan and Consent Decree dated 5/25/94, and the District's refusal to approve a Compliance Management Plan in a form acceptable to the State Superintendent;

4. The Board has not identified a lender that has agreed to advance, or is even considering advancing, a loan in the required amount of 29.5 million dollars;

5. The District's debt-to-revenue ratio is 25%—the highest in the state among comparable districts in the state:

| | | |
|---|---|---|
| a. | Akron | 1.8% |
| b. | Canton | 4.7% |
| c. | Cincinnati | 7.0% |
| d. | Youngstown | 13.1% |
| e. | Toledo | 1.0% |
| f. | Columbus | 0.% |
| g. | Dayton | 0.% |

6. The District concedes existing and projected escalating indebtedness in the following amounts:

7. The absence of effective Fiscal and Management Controls, and other Systems Controls, has exacerbated the District's operational shortcomings and materially eroded its efforts and capability to fulfill its educational and Court ordered desegregation responsibilities;

8. The announced resignation and departure of the District Superintendent, and the recent abdication in January of 1995 of two key staff personnel, i.e., the Deputy Superintendent of Educational Programs and the Deputy Administrator of Support Services, has created a leadership and management void within the District;

9. The Coopers & Lybrand 1991–92 Budget Analysis Report commissioned by the District dated March 10, 1991, as confirmed by a District–Wide Facility Study of the Cleveland City Schools dated December 15, 1994 conducted by DeJong & Associates, Inc. and Planning Advocates, Inc., concluding that in 1991, the District had eleven million square feet of building capacity (suitable for an enrollment of 110,000 students), of which 4 million square feet was excessive in light of the District's stabilized enrollment of approximately 70,000 to 73,000 students and the recommendation of those reports that between 14 and 25 of the District's buildings should be replaced or abandoned as beyond repair, has been ignored by the Board for at least two, and more probably three, years last past. (See also this Court's Order of June 4, 1984, addressing a Board request submitted in April of 1980 requesting permission to systematically close eighteen school facilities, which request was approved in August of 1980 and later abandoned by the Board.);

10. The Board has no viable contingency plan in place to effectively address the current deteriorating Professional and Executive Staffing and Fiscal conditions that prevail within the District:

(a) Although the Court commends the Board in seeking a dialogue with the *Business Community* with a view toward evolving long-range management of fiscal and system controls in the District and encourages the District's effort to involve the *Business Community* in meaningful oversight responsibility, the corrective measures proposed by the District lack definition and will not alleviate the immediate crises confronting the District;

11. The State Superintendent has acknowledged the responsibility and authority invested in his office by the Ohio Constitution and its duly enacted statutes, the Court's Desegregation Remedial Orders, the Consent Decree and this Court's Orders dated 5/16/79 and 5/13/86, and has advised the Court of his office's ability to immediately implement emergency action necessary to stabilize the crises confronting the District and present, for Court approval, a finalized interim and long-range plan for the reorganization of the District's Management Systems and Fiscal and Budgetary Controls;

12. The Court assigns credibility to the State Superintendent's professional and administrative credentials, his experience and commitment to exercise the responsibility delegated to his office, including his continued implementation of Vision 21;

13. The District is confronted with a financial crisis of magnitude and is without an experienced executive staff necessary for an uninterrupted and effective implementation of its Desegregation Remedial Orders of this Court and the Consent Decree of 5/25/94; and

14. Any interruption or delay in the timely execution of the District's executive responsibilities will be detrimental to and materially jeopardize the status of and the effective continuing implementation of the Court's Desegregation Remedial Orders and the Consent Decree of 5/25/94.

The Court concludes, as a matter of law, that the ultimate supervision of the District has been delegated to the State Superintendent, acting on behalf of the State of Ohio Board of Education, pursuant to authority vested in that office by the Ohio Constitution, its duly enacted statutes, the 2/6/78 Remedial Order of this Court, the 5/25/94 Consent Decree incorporated therein, this Court's final orders dated 5/16/79 and 5/13/86 and this Order.

Accordingly:

1. The State Superintendent is directed to assume immediate supervision and operational, fiscal and personnel management of the District, including, but not limited to, administration of its educational policies and all other powers incident thereto during the state of crisis confronting the said District and until further order of this Court.

2. The State Superintendent shall forthwith expedite approval of the State Board of Control to negotiate a loan in the amount of 29.5 million dollars in the name of the Cleveland School District to provide necessary funding for the operation of the District for the remainder of the fiscal year ending June 30, 1995, and will lend the support of his office to negotiate such a loan with available interested lenders.

3. The State Superintendent shall immediately initiate and implement action to designate and appoint Professional and Executive Staffing under his immediate direction and control necessary to the uninterrupted implementation of this Court's various Desegregation and Remedial Orders, including this Order and the Consent Decree of 5/25/94.

4. The State Superintendent shall finalize the development and implement, subject to Court approval, an interim and long-range plan of reorganization of the District's Professional and Executive Staffing, its Management and Control Systems, its Budgetary and Fiscal Controls, and all things incidental to stabilizing the fiscal and operational performance of the District during its period of crisis.

5. The State Superintendent shall, on a regular monthly basis, report to the Court the progress and status of the reorganization of the Professional and Executive Staffing of the District and its Systems Budgetary and Fiscal Controls.

6. The Board, the District, and their Professional, Executive and other personnel shall support the actions directed by the State Superintendent without direct or indirect interference with his implementation of this Court's Order.

7. The Board shall, by not later than May 1 of 1995, identify at least 14 school buildings that should be closed as beyond repair and recommend to the State Superintendent a schedule of closing dates.

8. The Board, in consultation with the State Superintendent, shall continue to consider and determine the timing for resubmission of a school operating levy to the electorate.

The Court is unaware of any State laws which this Order contradicts. To the extent any State law provision shall impede the implementation of this Order, such law is held to be inapplicable. This Order is necessary to remedy rights under the Fourteenth Amendment under the United States Constitution and necessarily takes precedence over any contrary State or local laws or provisions. *See, e.g., Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II* ); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Jenkins v. Missouri,* 639 F.Supp. 19, 43–46 (W.D.Mo.1985), *aff'd* 807 F.2d 657 (8th Cir. 1986), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987).

Hopefully, the Board, the District and the entire community is prepared to recognize the existing realities of the crisis confronting the Cleveland school system and the need for immediate, decisive, and perhaps unpopular action required to eliminate all vestiges of desegregation and expediently return the control of the schools to local authorities without judicial supervision at the earliest practicable date, thereby making the Board accountable to the citizenry and the political elective process of the Cleveland School District.

IT IS SO ORDERED.

APPENDIX D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

[Filed September 17, 1992]

Civil Action C73–1300

Richard J. McCain, et al. Plaintiffs,

vs.

James A. Rhodes, et al. Defendants.

PLAINTIFFS' PROPOSAL FOR REP-
RESENTATION AND COMMU-
NICATION WITH CLASS

Judge FRANK J. BATTISTI.

Now comes James L. Hardiman and Thomas I. Atkins, counsel for the plaintiffs, Richard J. McCain, et al., in accordance with this Court's Order of June 30, 1992 and submit the enclosed, plan for regular, meaningful communications among counsel, the new class representatives and the class as a whole.

Plaintiffs further submit that the previously approved Class Representatives, Richard J. McCain, Rashidah Abdul–Haqq, Rhonda Eberhart, Samiah Ghani and Cynthia Triplett have approved of this plan and feel that it would be in the best interests of the more than 50,000 African–American students that currently attend the Cleveland Public Schools and their parents.

Respectfully submitted

/s/ James L. Hardiman
James L. Hardiman,
Reg. No. 0032043
HARDIMAN, ALEXANDER,
BUCHANAN & HOWLAND
1414 Diamond Building
1100 Superior Avenue
Cleveland, Ohio
44114–2590
(216) 696–5444
Thomas I. Atkins
135 Eastern Parkway,
Suite 11–B–1
Brooklyn, New York 11238
(718) 538–4153

CERTIFICATE OF SERVICE

A copy of the foregoing Proposal for Class Communication was sent by regular United States Mail to Mark O'Neill, Esq., Weston, Hurd, Fallon, Paisley & Howley, 25th Floor, Terminal Tower, Cleveland, Ohio 44113; Ricardo B. Teamor, TEAMOR & AGYEMAN, The Superior Building, 815 Superior Avenue, N.E. Suite 1320, Cleveland, Ohio 44114; Frederick Nance and John Lewis, Squire, Sanders & Dempsey, 127 Public Square—Suite 4900, Cleveland, Ohio 44114, Stephen Rowan, Interim General Counsel, Cleveland Public Schools, 1380 East Sixth Street, Cleveland, Ohio 44114 and Daniel J. McMullen, Office on School Monitoring & Community Relations, 511 Terminal Tower, Cleveland, Ohio 44113 this 12th day of September, 1992.

/s/ James L. Hardiman
James L. Hardiman,
Attorney for Plaintiffs

**PLAINTIFFS' PROPOSED CLASS PLAN**

**I. OBJECTIVE**

Plaintiffs' Class Representatives submit that the approximately 70,000 students that attend the Cleveland Public Schools are so numerous as to render direct contact, on a regular basis, impractical. Nevertheless, as the case begins to wind down, it is important to convey to all students and their parents, as well the class of African–American students which Plaintiffs' class represent, current and significant developments in the desegregation process as well as the issues which directly or indirectly affect their interests.

Consequently, regular and meaningful communications among the Plaintiffs' class is not only desirable, but essential to monitor the numerous developments in the desegregation process, assist in the elimination of all vestiges of past discrimination and solicit the concerns and perspectives of the affected parties.

In the opinion of Plaintiffs, the implementation of this plan will assist the Class Repre-

sentatives and Class Counsel in discharging their duties of communication with the entire class and, ultimately, improving the quality of education for all students in the Cleveland Public Schools.

## II. PLAN OF OPERATION

### A. COMMUNICATIONS COMMITTEE

1. There will be created a Communications Committee for the purpose of communicating with the Plaintiffs' Class and addressing educational issues.

2. The Communications Committee will be composed of all Class Representatives, at least two Representatives from each of the six existing clusters in the system and designated representatives of existing community organizations.

3. Cluster Representatives shall be eligible to serve on the Communications Committee if they currently have children in attendance at a Cleveland Public School, are members of the Plaintiffs' Class and members of their School Community Council.

 a. Cluster Representatives will serve on the Communications Committee at the discretion of the Class Representatives and so long as they are committed to "equal Protection of the laws" for students and parents in the Cleveland Public Schools and discharge their duties of (1) maintaining and fostering open, meaningful communications with the class of African–American students whom they represent and (2) addressing issues of improved educational opportunities for students attending the Cleveland Public Schools.

4. Community Organizations or their designated representative will be eligible to serve on the Communications Committee at the discretion of the Class Representatives and to the extent that they have historically exhibited an interest in educational and/or desegregation issues in the Greater Cleveland area.

5. The Communications Committee will be chaired by a Class Representative to be selected by the Class Representatives.

### B. MEETINGS

1. The Communications Committee consisting of the Class Representatives, Attorneys for the Plaintiffs' Class, Representatives of designated community organizations and such other groups and individuals as the Class Representatives shall identify, will meet, on a regular basis, but not less once every alternate month. All meetings will be closed to facilitate full and candid exchanges.

2. Cluster and Class Representatives will meet not less than annually with invitations/announcements extended to all members of the Plaintiffs' class at a Public Place to be advertised not less than thirty days in advance with the members of the Plaintiffs' class. Maximum participation will be encouraged so as to insure validity for actions proposed or opinions solicited.

 a. Meetings of the Class Representatives and Communications Committee shall address topics of concern to the Plaintiffs' Class, including though not limited to implementation of the Court's Remedial Orders, monitoring of the desegregation process and creation of an improved educational environment for the Plaintiffs' class.

 b. Plaintiffs' counsel shall report on Court proceedings and solicit input from Class and Cluster Representatives relative to educational topics of historical significance, developments in educational legal precedents, implementation of the Court's Remedial Orders and educational subjects of general concern.

 c. Class or Cluster representatives shall report and solicit discussion on problems in the implementation of the Remedial Orders, components of the Court's Remedial Orders which can be refined and/or improved, methods of improving the delivery of educational services to the Plaintiffs' class and such other relevant matters that pertain to education of the Plaintiffs' class in the Cleveland Public Schools.

### C. COMMUNICATIONS

1. In addition to being a member of the Plaintiffs' Class and their School Community Council (SCC), each Cluster Representative shall be and function as a liaison between the

SCC, the Class Representative and Class Counsel.

2. Each Cluster Representative shall be responsible for distributing pertinent information to the members of the Plaintiffs' Class and the SCCs in their respective cluster.

3. Each Cluster Representative shall also be responsible for communicating topics of concern from members of the Plaintiffs' Class in their respective cluster and the SCC's in their cluster to the Communications Committee at its normal meetings or, in the case of exigent circumstances, at special call meetings.

4. Cluster and Class Representatives will encourage open and frank dialogue at the SCC and/or Communications Committee meetings on topics pertaining to implementation of the Court's Remedial Orders, monitoring of the desegregation process and creation of an improved educational environment for the Plaintiffs' class.

5. Bulletins, notices, flyers and other information may be distributed by the Cluster/Class Representatives via students in the school, the school district mail distribution system or, when feasible, via the United States Mail.

6. Cluster and Class Representatives shall utilize whatever creative methods of communicating with the class and soliciting their respective opinions as they may consider feasible.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

[Filed June 30, 1992]

C73–1300

Robert Anthony Reed, III,
et al., Plaintiffs,

v.

James A. Rhodes, et al., Defendants.

*ORDER*

BATTISTI, District Judge.

Before the Court is Plaintiffs' motion to substitute class representatives. The new class representatives will have the responsibility of fairly and adequately protecting the interests of the class as a whole, pursuant to Fed.R.Civ.Pro. 23(a)(4). The motion is GRANTED.

Accompanying the need for appropriate class representatives is a need for regular, meaningful communications among Plaintiffs' counsel, class representatives, and the class as a whole. In litigation of this nature, where Plaintiffs' counsel represent the interests of more than 50,000 black students and their parents, the attorneys must not only inform their clients on the progress of the case but also be informed by their clients of their concerns and views. In keeping with the letter and spirit of the memorandum and order of March 13, 1992, the need is especially great at the present stage of the litigation.

Accordingly, Plaintiffs' counsel and the new class representatives are directed to submit seasonably, but not later than thirty (30) days hence, a plan for regular, meaningful communications among counsel, the new class representatives, and the class as a whole.

IT IS SO ORDERED.

### APPENDIX E

### LEGAL ADVISORY COMMISSION ON ATTORNEYS FEES

Robert A. Reed, et al.

v.

James A. Rhodes, et al.

U.S. District Court, N.D. Ohio

Case No. 1:73 CV 1300

*MEMORANDUM*

Date: April 12, 1996

To: Hon. Robert B. Krupansky

From: Legal Advisory Commission on Attorneys Fees

Re: Fee Applications of Thomas I. Atkins, James L. Hardiman and David W. Whitaker

The Legal Advisory Commission on attorneys fees has met and considered at some length the revised fee applications submitted to the Court by attorneys Thomas I. Atkins, James L. Hardiman, David W. Whitaker and

Robert L. Green. As reflected in their February 15, 1996 applications, counsel for the plaintiffs have requested approval of their fee applications in the following amounts:

**Mr. Atkins:**

| | | |
|---|---|---|
| Fees: 1994–95: 361.75 hrs. × $340 per hr. = | | $122,995.00 |
| Expenses: | | 3,014.37 |
| Total | | $126,009.37 |

**Mr. Green:**

| | | |
|---|---|---|
| Fees: 1994–95: 459.5 hrs. × $75 per hr. = | | $ 34,462.50 |
| Expenses: | | 1,595.00 |
| Total | | $ 36,057.50 |

**Mr. Hardiman:**

| | | |
|---|---|---|
| Fees: 1992: 115.75 hrs. at $175 per hr. = | | $ 20,256.25 |
| 1993: 424.00 hrs. at $175 per hr. = | | 74,200.00 |
| 1994: 596.50 hrs. at $200 per hr. = | | 119,300.00 |
| 1995: 222.25 hrs. at $225 per hr. = | | 50,006.25 |
| Expenses | | 386.00 |
| Total | | $264,148.50 |

**Mr. Whitaker:**

| | | |
|---|---|---|
| Fees: 1992–95: 636.75 hrs. × $160 per hr. = | | $101,880.00 |
| Expenses: | | 427.99 |
| Total | | $102,307.99 |

---

Total fees and expenses sought by all four petitioners amount to $528,523.36.

Upon a close inspection of the revised fee petitions, the members of the Commission observed that these petitions present only a marginal enhancement of the petitions previously submitted to the Court. It is readily apparent that few, if any, of the deficiencies noted by the Court in its Order of December 29, 1995 were addressed by the petitioners in their revised fee petitions. As a result, and for the same reasons advanced in the Commission's report of November 1, 1995, the Commission has found it difficult, if not impossible, to properly evaluate the petitions and to assess their merit. Nevertheless, the Commissions submits to the Court the following observations.

1. Initially, the Commission examined the revised fee petitions to determine their mathematical accuracy, to confirm the submission of supporting documentation of out-of-pocket expenses, and to analyze the relative increases in each petitioner's hourly rate of pay.

That examination has disclosed the following data:

### Mr. Atkins

Addition of Mr. Atkins daily time charges produces a total of 367.75 hours, and not the 361.75 total of hours reported by Mr. Atkins.

Mr. Atkins reported his 1990–91 hourly rate as $240.00. His 1992–93 application for fees was previously approved at an hourly rate of $300.00, representing a 25.00% increase from 1990–91. His 1993–94 application for fees was previously approved at an hourly rate of $340.00, representing a 13.33% increase over his 1992–93 rate, and a 41.67% increase over his 1990–91 rate. Mr. Atkins requests the Court to approve the same rate of $340.00 for 1994–95.

### Mr. Green

Mr. Green's 1993–94 application for fees was previously approved at an hourly rate of

$75.00. He requests the Court to approve the same rate of $75.00 for 1994–95.

Mr. Green furnished no receipts or other documentation for any of his out-of-pocket expenses.

### Mr. Hardiman

Addition of Mr. Hardiman's daily time charges for 1992 produces a total of 111.25 hours, and not the 115.75 total of hours reported by Mr. Hardiman. Addition of Mr. Hardiman's daily time charges for 1993 produces a total of 419.50 hours, and not the 424.00 hours reported by Mr. Hardiman. Addition of Mr. Hardiman's daily time charges for 1994 produces a total of 596.00 hours, and not the 596.50 hours reported by Mr. Hardiman.

Mr. Hardiman has furnished receipts for out-of-pocket expenses totaling $304.00, and not the $386.00 reported in his petition.

Mr. Hardiman's 1990–91 application for fees was previously approved at an hourly rate of $175.00. For 1992–93, he requests the Court to approve the same rate of $175.00. Mr. Hardiman requests the Court to approve a rate of $200.00 for 1994, which represents a 14.29% increase over his 1990–93 rate. Mr. Hardiman also requests the Court to approve a rate of $225.00 for 1995, which represents a 12.50% increase over the rate he requests for 1994, and a 28.57% increase over his 1990–93 rate.

### Mr. Whitaker

Addition of Mr. Whitaker's daily time charges produces a total of 636.25 hours, and not the 636.75 total of hours reported by Mr. Whitaker.

Mr. Whitaker furnished no receipts or other documentation for any of his out-of-pocket expenses.

Mr. Whitaker's 1990 application for fees was previously approved at the rate of $110.00. He requests the Court to approve a rate of $160.00 for 1992–95, which represents a 45.45% increase over his 1990 rate.

2. There was no material improvement in the amount of detail furnished in the descriptions of services rendered by any of the petitioners. All too often, very large blocks of time are assigned to activity that is described in only the most cryptic fashion. For example, numerous references to telephone discussions and conference calls of hours-long duration, do not furnish sufficient information about the subjects of those conversations commensurate with the length of time devoted to such activity. Because an unusually large amount of reported time is devoted to telephone discussions and conference calls, this insufficiency of detail is significant. The unusual brevity of the descriptions of legal activity have made it difficult, if not impossible, for the Commission to determine if time reported was appropriate for the designated activity. Also, in a renewed effort to determine if the several fee petitions are consistent among themselves, the Commission has been hindered by the lack of detail in the descriptions of legal services. We find that such cryptic descriptions are not consistent with the standards for billing practices in this legal community, and have consequently rendered our mission difficult, if not impossible, to fulfill.

3. With respect to the reported hours of the several revised fee petitions, the Commission recommends that calculation of the petitioners' fees should reflect the mathematical corrections noted in item 1 above. More problematic, however, is the petitioners' practice of recording their time charges in half hour increments, a practice which is decidedly inconsistent with the standards for billing practices in this legal community. As noted by this Commission in its report to the Court of November 1, 1995, and as observed by the Court in its December 29, 1995 Order at 16–17, standard billing practices for billing on an hourly basis require that time charges be recorded in 6 minute increments, i.e. tenths of an hour. The petitioners' renewed determination to continue their practice of reporting their time in 30 minute increments demonstrate their rejection of the billing practices generally accepted in this legal community. Indeed, as stated in the petitioners' February 15, 1996 Response To Issues Raised By The Court, "Plaintiffs have rejected the approach utilized by some firms in which an effort is made to bill in 5–, 10– or

15-minute increments." (Response at 5). The Commission believes that the petitioners are not privileged to reject the generally accepted billing practices in this legal community.

In explaining their rejection of local billing practices, the petitioners state that they "have consistently excluded from the hours billed those days on which the time spent was less than 30 minutes." (Response at 4). However generous that concession, the accuracy of petitioners' time charges suffers from a failure to fully and accurately report all of their time, and leaves open to speculation at what point in the range from 31 to 60 minutes petitioners have decided to graduate a time charge from a half hour to a full hour.

Thus, the Commission's effort to assess the appropriateness of the time charged by the petitioners has been frustrated by the petitioners' determination to report their time in 30 minute increments.

4. As noted in item 1 above, some of the petitioners responded to the Court's request that out-of-pocket expenses be documented and that receipts be furnished to the Court. Others did not. In some instances, receipts were furnished for some, but not all expenses. The Commission finds that standard billing practices in this legal community require an attorney to furnish documentation of out-of-pocket expenses in the form of receipts. Petitioners should be compensated for such expenses only to the extent that such documentation has been furnished to the Court in clearly legible receipts.

5. With respect to the hourly rates of pay sought by the petitioners, the Commission finds that with the exception of Mr. Green at $75.00 per hour, the rate increases requested are not commensurate with the rates for attorneys fees in this legal community. The Commission has determined that the requested annual increases for the periods relevant to their applications are not consistent either with the rate of inflation over those years, or generally accepted increases of attorneys fees within this legal community. In some instances, rates previously charged by the petitioners far exceed the acceptable rates for attorneys in this community. It is the collective judgment of the members of the Commission that the hourly rates of attorneys fees paid to other attorneys in this action, ranging from $95.00 to $187.00, as reported by this Court, in its December 29, 1995 Order (page 7-8 n. 4), accurately reflects reasonable and prevailing rates for attorneys fees within this legal community. Therefore, the Commission recommends that, consistent with the range of fees noted above, the Court approve a scale of hourly rates with reasonable increases over the time periods referenced in the revised fee petitions, but should nevertheless establish fee caps, approving an hourly rate of pay for Mr. Whitaker which does not exceed $135.00; for Mr. Hardiman, an hourly rate which does not exceed $190.00; and for Mr. Atkins, an hourly rate which does not exceed $200.00.

6. Finally, the Commission recommends that the Court establish a formal billing schedule which requires all petitioners to submit future petitions at the same time, (preferably on a quarterly basis, but not less than semi-annually), and for the identical period of time. We suggest that all fee petitions for a stated period be submitted to the Court within a specified period of time, not to exceed 6 weeks beyond the reporting period.

With the submission of this Memorandum, the Legal Advisory Commission on attorneys fees has completed its current assignment as best it is able under the circumstances, and awaits further instruction from the Court.

Respectfully submitted,

Richard Alston

James W. Barnhouse

Dale F. Kainski

William R. Norton

APPENDIX E-1

## LEGAL ADVISORY COMMISSION ON ATTORNEYS FEES

Robert A. Reed, et al.

v.

James A. Rhodes, et al.

U.S. District Court, N.D. Ohio

Case No. 1:73 CV 1300

### *MEMORANDUM*

Date: November 1, 1995

To: Hon. Robert B. Krupansky

From: Legal Advisory Commission on Attorneys Fees

Re: Fee Applications of Thomas I. Atkins, James L. Hardiman and David W. Whitaker

The Legal Advisory Commission on attorneys fees has met and considered at some length the fee applications submitted to the Court by attorneys Thomas I. Atkins, James L. Hardiman and David W. Whitaker. Mr. Atkins has petitioned the Court for an award of $126,401.04 for himself, and an additional award of $36,057.50 for Robert L. Green, a consultant retained by Mr. Atkins. Mr. Hardiman has petitioned the Court for an award of $263,786.00, and Mr. Whitaker has petitioned the Court for an award of $102,307.99. Together, these three applications seek an award of attorneys fees and costs in the amount of $528,552.53.

At the outset of our examination, the members of the Commission found it difficult to assess the merit of these fee applications. Because the information contained in the fee applications is not presented in sufficient detail to permit an objective and thorough analysis, the Commission is unable to offer any recommendation of approval or disapproval at this time. Therefore, in the interest of fairness to counsel, as well as to the parties, we recommend that the Court offer the petitioning attorneys and their retained consultants an opportunity to revise and resubmit their fee applications with the following considerations in mind.

From our knowledge of attorney billing practices in the local legal community and our understanding of controlling law, we offer the following observations, without reference to priority in their presentation, as guidance to the Court and petitioning counsel.

1. Recognizing a legitimate concern for the protection of the attorney-client privilege, we nonetheless believe that many, if not most, of the daily entries presented in these fee applications lack sufficient detail in their description of legal services to permit the Court to fairly evaluate the measure of time devoted to the work performed. The same comments apply with respect to time charges prepared by experts employed to assist counsel.

2. We do not believe that it is the usual and customary billing practice in the legal community where this lawsuit is venued to charge for time in half hour or quarter hour increments, as reflected in these fee applications. In our experience, clients rightfully demand the reporting of time charges in six (6) minute increments, i.e. tenths of an hour. The same comments apply with respect to time charges prepared by experts employed to assist counsel.

3. Although we recognize the propriety of petitioning the Court for compensation for time devoted to the preparation of fee applications under 42 U.S.C. § 1988, we do not believe standard billing practices to include compensation to attorneys for time devoted to the preparation and posting of time charges and the preparation of client invoices.

4. There appeared to be some inconsistency in the daily time charges recorded by the attorneys. In some instances, for example, we observed different times posted for the same work performed by the respective attorneys who were apparently working together on the same matter on the same date. In other instances we noticed that while one attorney posted a time entry, others posted no time entry at all, even though the posted entry suggested that the attorneys were working together on the same matter on the same date.

5. In order to properly evaluate out-of-pocket expenses incurred by counsel, it is necessary to not only provide a detailed explanation of individual expenses, but to also furnish to the Court copies of invoices and receipts for each such expense. The same comments apply with respect to out-of-pocket expenses incurred by experts employed to assist counsel.

6. We are concerned about the appropriateness of charging for meals.

7. We also have some concern over the magnitude of the hourly rates employed by the respective attorneys and question wheth-

er they properly reflect the usual and customary rates employed in the legal community where this lawsuit is venued. Likewise, we express some concern over the measure of the escalation of hourly rates from one year to the next, and whether those increases are consistent with the usual and customary escalation of rates employed in this legal community.

8. From the perspective of both the client and the billing attorney, we do not believe that it is an accepted practice within the local community to accumulate unbilled fees and costs for extensive periods before fee bills are submitted to the paying client. Charges dating back more than one year, or, as in one instance here, in excess of 3½ years, can severely impact the finances and significantly disrupt the budgetary planning of both client and counsel. Furthermore, because the reasonableness of such fee applications should be determined within the relevant period in which such charges are accrued, the Commission is essentially deprived of an opportunity to correlate the respective time entries of the various petitioners. We believe the Court should encourage counsel to submit fee applications in a timely and regular manner.

9. Finally, the Commission observed that two of the three fee applications did not include a certificate of service upon all counsel of record, as required by the Federal Rules of Civil Procedure. We feel that it is important for the petitioners to apprise all parties of their applications and to assure the Court that opposing parties have been afforded an opportunity to enter a response thereto.

With the submission of this Memorandum, the Legal Advisory Commission on attorneys fees awaits further instruction from the Court.

> Respectfully submitted,
> Richard Alston
> James W. Barnhouse
> Dale F. Kainski
> William R. Norton